## ATTORNEY GENERAL *vs.* WILLIAM L. GARRISON & others.

When a trustee, directed by a decree of court, settling a charitable bequest *cy pres*, to pay over the trust fund to a particular object, at such times and in such sums as he in his discretion may see fit shows by his language and acts that he will not exercise the discretion because he believes that an apportionment of the fund between that object and another would better conform to the wishes of the testator, he may and will be removed.

A fund was bequeathed in 1861, to nine trustees named in the will, in trust "for them to use and spend at their discretion, without any responsibility to any one, in such sums, at such times and places, as they deem best," for the preparation and circulation of books

and newspapers, and the delivery of speeches and lectures, and "such other means as in their judgment will create a public sentiment that will put an end to negro slavery in this country;" and they were constituted by the will "a board of trustees for that purpose, with power to fill all vacancies that may occur from time to time by death or resignation." On a bill filed by the executor for instructions, this bequest was affirmed as a valid charity, and an order was passed in 1867, directing a master to frame a scheme to carry out *cy pres* and in a lawful manner the charitable purposes of the testator, with liberty to the attorney general and the trustees to submit schemes for approval; and upon his report a decree was entered directing the executor to pay the then residue of the fund (about $9000) to seven of the said trustees, (two of the nine having declined the trust,) "to be by them paid over, at such times and in such sums as they in their discretion may see fit," to the treasurer of a society engaged in maintaining schools to educate the freedmen in ordinary branches of learning, "to be by them [the society] expended in promoting the education, support and interests generally of the freedmen " in the states in which slavery had been abolished during or after the civil war. The executor then paid the fund to the seven trustees, and the society (being in constant need of much larger funds to maintain its schools, and being obliged to dismiss many teachers for want of money) requested them to pay it to its treasurer. Three of the trustees were willing and desirous to pay the whole fund to the society; but four resisted such a payment, on the ground that only part of the fund should, in their opinion, be applied to the purposes of the society, and the remainder to secure by popular agitation the right of suffrage· to the freedmen, such an apportionment being, in their opinion, what the testator would wish if he were living. In consequence of their differences of opinion, the trustees failed for nearly a year to appropriate any part of the fund to any object. Upon an information then filed by the attorney general at the relation of the treasurer of the society, it appearing that there was no prospect of any change of views among the trustees, and that the four were so unwilling to execute the trust by applying the whole fund to aid the society to maintain schools for freedmen that they preferred to be removed rather than be agents of its application in that manner: and no reason being suggested why an immediate payment of the whole fund to the treasurer of the society would not be discreet if it was to be so applied; *Held*, that a decree should be entered for the removal of the four trustees and the nomination of persons to fill the vacancies.

INFORMATION filed November 11, 1868, by the attorney general at the relation of the treasurer of the New England branch of the American Freedmen's Union Commission, setting forth that in 1861 Francis Jackson's will was duly proved and allowed in the probate court for Suffolk, containing in its fourth article a bequest of $10,000 to William Lloyd Garrison, Edmund Quincy, Samuel May, Jr., Wendell Phillips, Charles K. Whipple, William I. Bowditch, Edmund Jackson, Lydia Maria Child and Maria W. Chapman, in trust "for them to use and spend at their discretion, without any responsibility to any one, in such sums, at such times and places, as they deem best, for the preparation and circulation of books, newspapers, the delivery of speeches, lectures, and such other means as in their judgment

will create a public sentiment that will put an end to negro slavery in this country," constituting them "a board of trustees for that purpose, with power to fill all vacancies that may occur from time to time by death or resignation of any member or of any officer of said board," and appointing Phillips president, Jackson treasurer, and Whipple secretary, of the board; that Mrs. Child and Mrs. Chapman refused to act as members of the board, and the vacancies caused by their refusal were never filled, but the seven others above named had alone acted as trustees; and that afterwards Edmund Jackson, the executor of the will, brought his bill in equity in this court, praying the aid and instructions of the court in regard to the true construction of the bequest and the proper administration of his trust as executor, whereupon proceedings were had resulting in a decree, establishing the bequest as a valid charity, and in 1867 ordering its execution *cy pres*, negro slavery having then been put an end to in this country.

By the report of those proceedings in 14 Allen, 596–599, it appears that the case was referred to a master, to frame a scheme for the application of the fund, to carry out, *cy pres*, and in a lawful manner, the charitable intents and purposes of the testator, with liberty to the attorney general and the trustees to submit schemes for his approval; that a portion of the fund had been spent by the trustees before any question arose as to the validity of the bequest; that only two schemes were suggested to the master for the appropriation of the residue, "namely, first, (which was approved by four of the seven trustees who had accepted the trust,) in part to the support of the Anti-Slavery Standard, a weekly newspaper published in the city of New York, and in part to the New England branch of the American Freedmen's Union Commission, or, second, (which was approved by the remaining trustees,) that the whole should be applied to the last named object;" that the master reported in favor of the second of these schemes; and that a decree was passed by the court in substantial conformity with his report.

The material part of this decree the information recited as follows: "And as to the sum of $10,000 given to the said trus-

tees by the fourth article of said will, a part of the same having been expended by said trustees before any question had arisen respecting the validity of the bequest, and no account of the part so expended having been requested by any party, and it appearing to the court that to apply any part of the remainder of said sum to the support of the newspaper called the ' Anti-Slavery Standard' would not so nearly and appropriately promote and carry out the general charitable intentions expressed by the testator in his will as the scheme reported by the master, with the modifications herein expressed, and no other scheme having been reported by the master or suggested to the court; it is ordered, adjudged and decreed, that the remainder of said last named sum, being $9259.80, be paid by said Edmund Jackson, executor, to the said trustees, to be by them paid over, at such times and in such sums as they in their discretion may think fit, to the treasurer of the New England branch of the American Freedmen's Union Commission, to be by them expended in promoting the education, support and interests generally of the freedmen (late slaves) in the states of the Union in which slavery has been abolished, either by the proclamation of the late President Lincoln or the amendment of the Constitution."

The information then set forth that the executor duly paid over the $9259.80 to the trustees, in performance of the decree; that (they, acting as a board, having for a long time delayed to make any payment to the treasurer of the Commission) a formal written request and demand was made on them in April 1868 for the funds directed by the decree to be paid as above recited, but that they never made any payment whatever from said sum and fund to the treasurer or any other officer of the Commission; and that the attorney general had been told and believed " that certain of said trustees have declared that they will never consent, either under the present or any future decree of the court, to pay over any part of said sum and fund to said treasurer, and that they do not now intend ever to make any such payment," whereas, the information further set forth, " the exercise of a wise and sound discretion and the proper administration of

said charity require that the whole or a considerable part of said sum and fund should be paid over to said treasurer forthwith, and that the same ought to have been so paid over heretofore."

The prayer was, for the court " to pass a new order and decree respecting the administration of said charity, in order that the same may not fail; to order the said trustees to pay over the said fund and sum, with interest, at such times and in such amounts as to the court shall seem meet; and to remove such of the said trustees, if any, as may refuse or omit to obey the order and decree of the court, and appoint a new trustee or trustees in the place thereof;" and for general relief. All the seven acting trustees were summoned as parties defendant.

Garrison, Quincy and May filed a joint answer, admitting that the allegations of the information were true; but denying that they, or either of them, had ever declared that they or he would never consent to pay over any part of the fund to the treasurer of the Commission, as alleged, and alleging that on the contrary " they have long desired and endeavored to obey and carry into effect the said decree of this court, and to cause to be paid over to said treasurer the said sum and fund, in order that the same may be expended by the said New England branch of the Freedmen's Union Commission for the purposes indicated in said decree, but their efforts to that end have been defeated by the opposition of their associates and cotrustees, the said Phillips, Jackson, Bowditch and Whipple."

May, further answering, set forth memoranda made by him personally at meetings of the trustees, to the effect that on March 27, 1868, at their first meeting after the decree of the court, Whipple moved, and Jackson seconded the motion, for a payment of $500 to the Commission, and Quincy moved, and May seconded an amendment, to pay over at once to the treasurer of the Commission the entire fund ; that Bowditch, Whipple and Phillips, in a discussion which followed, used language indicating a disposition on their part not to apply the whole fund in conformity with the decree of the court, and Garrison and Quincy objected to Whipple's motion as dilatory and virtually defeating the object of the decree ; that Quincy's pro-

posed amendment was defeated, he, with May and Garrison, voting in favor of it and the four other trustees against it, and then the motion of Whipple was defeated by a tie vote, he and Jackson voting in its favor, Quincy and Garrison against it, and Phillips, Bowditch and May not voting, the latter stating (substantially as previously stated, for themselves, by Garrison and Quincy) that he considered Whipple's proposition to be virtually obstructive of the decree of the court; that, at the next meeting of the trustees, on May 2, 1868, Jackson moved, and Whipple seconded the motion, for a payment of $1000 to the Commission for the year then current, and May moved and Garrison seconded an amendment for the payment of the whole fund to the Commission without delay, and Garrison read in this connection a letter from a member of the teachers' committee of the Commission, setting forth the special and very urgent needs of the freedmen's schools in Maryland; that this proposed amendment was defeated by a vote precisely the same by which the similar motion had been defeated at the previous meeting; that another amendment, then moved by Garrison for the payment to the Commission of one half of the fund at once, and one half the next year, was also defeated by the votes of Phillips, Jackson and Whipple against those of Garrison, Quincy and May (Bowditch not voting); and that Jackson's original motion was also defeated by the votes of Garrison, Quincy and May against those of Jackson and Whipple (Phillips and Bowditch not voting); that then Bowditch moved that a solicitor be requested to apply to the court for a modification of the decree, which motion also was defeated by the votes of Garrison, Quincy and May against those of Phillips, Bowditch and Whipple (Jackson not voting); and that then the meeting was adjourned, and no other meeting had since been held.

Garrison and Quincy, further answering, said that these memoranda, as recited by May, were true according to their recollection and belief; and all three, further answering, alleged that neither of the two sums ($500 or $1000) proposed at those meetings to be given to the Commission would be adequate to its wants; that, " on account of the smallness of said sums, the

giving of either of said sums to said society for said year would not in their judgment satisfy the requirements of said decree;" and that " it was because they were of opinion that each of said sums was entirely insufficient in amount that they opposed the giving of said sums to the said society." They further an-swered that they were informed and believed that, after the last meeting of the trustees and before the filing of the information, a second written request of the Commission for the payment of the fund was presented to Whipple, as secretary of the trustees, to be laid before the board, and he neglected to call a meeting of the board to lay it before them, stating that "it would be useless to do so, and that there were no changes in the opinions of the trustees."

Finally they alleged, in their answer, that large amounts of money were urgently needed by the Commission for immediate use in promoting the education, support and general interests of the freedmen in conformity with the decree; that a proper administration of the charity created by the will required an im-mediate payment of the whole fund to the Commission, to be so used; and that, as intimate personal friends of the testator, and colaborers with him for many years in the same philan-thropic and charitable causes, they were well acquainted with his mental characteristics, modes of action and governing de-sires and aims, especially in regard to the rights and liberties of the colored population of the United States, and entertained no doubt that his bequest could not be applied more strictly in accordance with his wishes than in promoting the efforts of the Commission to aid, support and instruct the freedmen; wherefore they did not oppose the passing of the orders and decrees prayed for in the information, but requested that the court would order the trustees to pay the fund to the Commis-sion, at certain times and in certain amounts, as to the court should seem meet.

Phillips, Whipple and Jackson also filed a joint answer, in which, after substantially admitting the allegations of the infor-mation as to the proceedings under the will and trust, up to and including the decree of the court for the execution of the trust

*cy pres,* they stated that Jackson, as executor, in obedience to the decree, paid over to the trustees the $9259.80 on January 1, 1868, upon which sum there had since been earned six months' interest at the rate of five per cent. per annum, and that no payment of this fund or any part of it had been made to the treasurer or any officer of the Commission, notwithstanding a written request made of the trustees, on or about April 14, by the president and in the name of the Commission, for the payment, " as soon as may be " to the treasurer, " of the funds directed by the supreme judicial court to be paid by you to said Commission."

They further alleged that the trustees were organized as a board in February 1862, had continued to act as such, and had caused to be kept an official record of their acts, and that no other or different action had been taken by them than was so recorded; and they appended to their answer a transcript (attested by Whipple as secretary of the board) of the record of proceedings at the two meetings, of March 27, 1868, and April 21, 1868, which differed in substance from the memoranda of the proceedings at those meetings set forth in the answer of May and above recited, in not containing so full lists of the names of the parties voting on the several propositions, and in not reporting precisely such language as was alleged by May, and confirmed by the allegation of Garrison and Quincy, to have been used by Phillips, Bowditch and Whipple, nor in some respects reporting the discussions at those meetings so fully as was done by May. But according to this record of the proceedings of the meeting of March 27, it appeared that, in speaking on Quincy's motion to pay over the whole fund to the Commission, Bowditch said that he " thought that the decision of this whole matter properly vested in the hands of the special trustees appointed by Francis Jackson, and saw no right in the court to dictate to these trustees an employment of this money at variance with the well known sentiments of the testator, and would not vote any of it to the Freedmen's Commission, except on application from them specifying the sum needed and the use to be made of it," and Phillips " commented on the peculiar character of Francis Jackson's will, and agreed in Mr. Bowditch's judg

ment as to the disposition of the money;" and according to this record of the proceedings of the meeting of April 21, it appeared that the motion of Bowditch concerning an application to the court for a modification of the decree was, "that we instruct" a solicitor named "to say to the court that such difference of opinion exists among the trustees that four of the seven cannot consent to vote the whole of this fund to the Freedmen's Commission, and that in view of this fact we ask the court to reconsider its action and refer to Edmund Jackson (brother of the testator, and named by him trustee and executor) the question what proportion of this fund should be paid to the Freedmen's Commission and what to the American Anti-Slavery Society."

Jackson and Whipple then further answered, for themselves only, denying that they had ever prevented or delayed "the payment of said fund to said treasurer in such amounts as seemed to them fit;" alleging "that the only propositions to pay over money to said treasurer against which they have voted were those made to pay over the whole of said fund, or half of it, at once, — payments which did not seem fit to them, and which, as they believed, they were authorized to oppose in the exercise of the discretion given to said trustees in said decree;" denying that they had ever made any such declaration as was alleged in the information to have been made by certain of the trustees, to the effect that they would never consent, either under the present or any future decree of the court, to pay over any part of the fund to the treasurer of the Commission, or any declaration of that purport; and referring to their votes in favor of paying over $500 at one time and $1000 at another time. Whipple, for himself only, then denied "that he has now any intention never to make any payment to said treasurer, as charged in said information, or any substantially like it;" but Jackson, for himself only, said that he deemed it his duty, "in candor and frankness to the court, to declare that, with his present view of his duty, and as now informed as to the objects of said Freedmen's Union Commission, he never could consent or vote to pay over the whole of said fund, whether in partial payments, from time to time, or in a single payment at once, to said treasurer."

Phillips, answering further, for himself only, denied that he ever voted against any proposal made by members of the board in regard to paying the fund to the treasurer of the Commission, except the single proposal to pay over the whole fund at once, " a payment which did not seem to him fit to be made, and which, as he believed, he was authorized to oppose in the exercise of the discretion given to said trustees in said decree," and denied ever opposing any proposition to pay over portions of the fund to the Commission ; and, as to the charge in the information concerning declarations by certain trustees of a determination never to pay over any part of the fund to the treasurer of the Commission, he denied " that, whatever he may have said in conversation by way of debate, he ever, formally or officially, as one of said trustees, made any such declaration, or any declaration of that import, or substantially like it," and referred to his abstinence from voting on the propositions for the payment of $500 and $1000, and to his vote in favor of Bowditch's motion " to make another appeal to this court to apportion said fund between said Freedmen's Union Commission and another instrumentality ; " but, in conclusion, he deemed it his duty, " in candor and frankness to the court, to declare," precisely in the language used by Jackson and above quoted, that, " with his present view of his duty, and as now informed " as to the objects of the Commission, he never could consent or vote to pay over the whole fund to it, whether in partial payments or a single payment.

All three, Jackson, Whipple and Phillips, finally denied that, even if it were fit and proper that the whole fund should be paid to the treasurer of the Commission at some time in a single payment, a wise discretion and proper administration of the charity would require that the whole or a considerable part of the sum should be paid to him forthwith, or should have been paid to him previously.

Bowditch filed a separate answer, admitting the allegations of the information concerning the proceedings up to and including the decree and the payment of the fund to the trustees by the executor; and that, notwithstanding the request and demand

made by the Commission on the trustees in April 1868, they had made no payment to its treasurer; and then, as to the charge in the information concerning declarations by certain of the trustees of a determination not to administer the trust in conformity with the decree of the court, he answered as follows: " that he has been willing, and has always, to the best of his recollection, on proper occasions, expressed himself willing, to pay over to the Freedmen's Union such portions of said fund (subject to the limitations hereinafter referred to) as in the exercise of the discretion reposed in the said board of trustees by the decree of this court they, the said board, should think fit, but he is advised and believes that the said request and demand " " did not render it incumbent upon the said board of trustees to pay over the whole or any part of said fund, because it furnished them with no information upon which to exercise the discretion which by the terms of said decree they are required to exercise as to the sums in which and the times when said money is to be paid over," and also " is advised and believes that the said decree of this court was not intended and does not purport to divest said board of trustees of the duty imposed upon them by the will, of exercising a sound discretion as to the times and manner of expending the testator's bequest," and further " is advised and believes, and submits to the court, that the purpose of said decree was simply to indicate an object other than, but supposed to be similar to, the object for which the testator intended to provide, and to leave to the trustees the same discretion as to the charity prescribed by the court which they had by the testator's will as to the charity named by him, except that the persons to whom the money is to be paid are limited, and he therefore submits to the court that the said trustees ought not to be commanded to pay over any part of said sum until the said Freedmen's Union shall have submitted to their sound discretion some specific object for which the money is to be used." Then, referring to his vote at the meeting of April 21, to pay over $1000 to the treasurer of the Commission, he stated that he so voted " without any further information than was contained in said request and demand and his own

general knowledge of the purposes and needs of said Union," and that he deemed it proper to state, in this connection, that he was informed, some time after the filing of the information, that another request, dated September 12, 1868, not therein referred to was made by the Commission for a sum of money from the fund, coupled with an offer of information as to the purposes for which the money was wanted; and he alleged "his entire willingness to consider such request whenever the same shall be laid before the board of trustees."

Further answering, he alleged that he was well acquainted with Francis Jackson, the testator, for many years, and believed that he knew and understood his character and opinions as shown by his life and his will; that the testator was a man of peculiar and extreme views, who took little interest in what are commonly called charities, but gave his time and means to agitation for the reform of political and social abuses which had the support of law and public opinion, and so soon as that support was withdrawn, his active interest ceased; that it was to the righting of wrongs rather than to the relief of suffering or want that the testator devoted himself while living, and intended, as the defendant believed, to devote his property after his death; that it was for the abolition of slavery by agitation that the testator gave the fund in question, and if slavery had been abolished in his lifetime, the defendant felt sure that he would have diverted his bounty, not for the amelioration of the negro's condition, but for the securing to him, by agitation, of *further political rights;* nor did the defendant think that the testator would have regarded the action of President Lincoln and the amendment of the Constitution as having "put an end to negro slavery in this country," so long as the negroes were denied the right of suffrage, without which their freedom could never be secure, and the defendant therefore believed that "negro slavery," in the sense in which those words were used by the testator, had not yet been "put an end to," so as to render a *cy pres* application of the trust fund necessary. Finally, the defendant said: "Holding these views as to Mr. Jackson's wishes and intentions, this defendant has always felt that the

decree of this court applying this money to the uses of the Freedmen's Union, or, in other words, substantially to the education of the negro, was one which, in a due regard for those wishes and opinions, ought not to have been made, and he has undoubtedly often said so in substance. In deference, however, to the views of others, whose means of knowing Mr. Jackson's opinions are equal to his own, he has always felt and expressed a willingness to pay over a portion, and the larger portion, of the fund to the American Freedmen's Union, upon proper evidence of their requirements, from time to time; and he has always hoped, until advised that it was useless to do so, that the court might be induced to modify said decree, so as to make it possible to divide said fund. But he does not feel that he ought to consent, notwithstanding the decree aforesaid, to the application of the whole fund to a purpose which he feels sure his testator would have disapproved of. Whenever, therefore, the amount which shall have been paid over to the Freedmen's Union shall exceed one half of the trust fund, unless a change shall take place, either in the defendant's views of his duty, or in the purposes or modes of action of said Freedmen's Union, it is probable that this defendant will refuse to vote any further payments to said Freedmen's Union."

Issue was joined on these answers; and a hearing had before the chief justice, who reserved the case for the consideration of the full court upon the pleadings and the following report:

" It appeared in evidence that the New England branch of the American Freedmen's Union Commission has been and still is engaged in maintaining schools in Maryland, Virginia, South Carolina and Georgia, for the education of freedmen in the ordinary branches of education; that it employs a large number of teachers, and has been in constant need of much larger sums than it has been able to obtain, in order to carry on this work, and for this reason has lately been obliged to dismiss a considerable number of teachers; and that it is still in pressing need of much larger funds therein than those in the hands of the trustees. No question is made as to its faithful appropriation of all the funds it receives. The defendants have been re-

quested to pay to the treasurer the money in their hands, as stated in their answers. Three of them, Messrs. Garrison, Quincy and May, have always been ready and desirous to have the whole trust fund paid to the society. They opposed the proposition, stated in the records, to pay over $500 at one time, and $1000 at another time, because they believed that the payment of so small an amount would not be a faithful administration of their trust, and that the purpose of their associates was to delay unreasonably the payment of such sums as in their opinion ought to be paid immediately in order to execute the trust properly. Mr. Garrison gave no other reason for his refusal to vote the appropriation, at one time of $500, and at another of $1000, except that here stated; and he admitted that $500 would procure a teacher for one year. Mr. Bowditch testified, in substance, that he was willing to pay the sum of $5000 to said society, provided the balance of the fund could be appropriated to efforts to secure to the negro the right of suffrage; that he believed that this would be more in conformity with the wishes of the testator than to pay it to the society; and that he thought that the decree of the court would authorize the appropriation desired by him; but if the court should so interpret the decree as to require the whole of the fund to be paid to the society for the promotion of their present objects, he could not comply with it, and the court must remove him. He said that he believed that Mr. Phillips agreed with him in his views of the matter. I understand that he would be willing to pay to the society the whole fund, on condition that they would appropriate the balance over and above the $5000 to efforts to influence the state legislatures to secure the right of suffrage to the negro, and to other similar efforts to secure that object, but not without such condition. Mr. Bowditch testified that he knew that $200 would procure a teacher for one year; and that they were procured for that amount for schools in Baltimore. I understand the facts to be in conformity with his statement. It appeared that Messrs. Whipple and Jackson concurred with him and Phillips. On account of these differences of opinion in respect to the matter, the trustees have failed to make any ap-

propriation of any part of the fund to any object. They have discussed the subject fully among themselves, and there is no prospect that any of them will change their views."

*C. Allen*, Attorney General. Whenever a discretion is vested in trustees as to their official action, it is subject to the supervision and control of a court of equity, for the prevention or remedy of abuses. *Amory* v. *Green*, 13 Allen, 416. This rule applies when trustees are to pay over money at such times and in such sums as they may think expedient. *Williams* v. *Bradley*, 3 Allen, 284, 285. Even if the language used in the decree of the court had been used in a will or other private instrument creating a trust, the discretion vested in the trustees would not extend so far as to give them power to defeat the equitable right of the Freedmen's Union Commission to the fund, but only to modify the time of payment; and if the duty under such a trust should at any time be unreasonably or improperly performed, a court of equity might and should give directions as to how it should be performed. This doctrine is especially applicable to charitable funds, that the charity may not fail. But this is not the case of a trust created by a private instrument. These trustees are appointed by the court to carry out the decree of the court. It has already been determined by the court that this fund shall go to the Commission; and the court reposed in the trustees whom it appointed a discretion as to the proper time and mode of paying it over. Being mere ministers of the court, they are of course subject to its supervision and control. It is not to be assumed that the court will be inclined to vary the substance of its decree on account of the unwillingness of certain of the trustees to execute it. Nor, indeed, in the present posture of the case, could such variation properly be made. *Thompson* v. *Goulding*, 5 Allen, 81. *Park* v. *Johnson*, 7 Allen, 378, 382. *Pingree* v. *Coffin*, 12 Gray, 289. *Clapp* v. *Thaxter*, 7 Gray, 384. The trustees are wholly unable to agree among themselves as to the time of making the payment. No proposition has ever received a majority vote; and this state of things is likely to continue. Since it is impossible for them to act, owing to dissensions among themselves; and since, for this

reason, the discretion reposed in them is wholly unexercised, it is a plain case for the court to interfere. The mere omission to act is ground enough for such interference. See *Gude* v. *Worthington,* 3 De G. & Sm. 389, and *In re Sanderson,* 3 Kay & Johns. 497. But *a fortiori,* where a trust is to be executed, and the trustees have become so hostile to each other that they will not act together, the court will interpose. 2 Story Eq. § 1288. In the present case certain of the trustees have not exercised such good faith as the law requires in the exe- cution of the discretionary powers intrusted to them. The good faith which the law requires is good faith to the views of the court. 2 Story Eq. §§ 1061, 1287. *Constabadie* v. *Constabadie,* 6 Hare, 414. It is apparent that certain of them have no intention to carry out the views of the court, except so far as their own views correspond therewith. Relief may be granted by an order that the trustees shall pay over the whole fund within a certain short time; and by retaining this information for such further proceedings as may become expedient hereafter.

*G. W. Phillips,* for Phillips, Jackson and Whipple; and

*G. Putnam, Jr.,* for Bowditch; submitted the case without argument.

CHAPMAN, C. J. The object of the information is, to enforce the execution of a charitable trust in conformity with a decree of the court. The defendants have received the trust fund, and it has been in their hands since January 1, 1868. They were directed by the decree " to pay it over, at such times and in such sums as they in their discretion might think fit, to the treasurer of the New England branch of the American Freedmen's Union Commission, to be by them expended in promoting the education, support and interests generally of the freedmen (late slaves) in the states of the Union in which slavery has been abolished, either by the proclamation of the late President Lincoln or the amendment of the Constitution." The society is engaged in maintaining schools for the freedmen, and the court are unanimously of opinion that the decree requires that the money, when received by the treasurer of the society, should be applied to the enterprise which it is now prosecuting.

Two of the trustees named in the will declined to accept the trust. Four of the other seven, namely, Messrs. Phillips, Jackson, Bowditch and Whipple, think that not more than five thousand dollars should be appropriated to the schools; but that the balance should be appropriated to secure to the negro the right of suffrage. They believe that such appropriation would be more in conformity with the wishes and feelings of the testator, if he were alive. But we cannot go behind the decree, and the trust must be executed according to its terms; and if we were at liberty to modify the decree, we could not sanction the proposed appropriation, because it would be for a purpose of a political nature, and not within any proper definition of a charitable trust. These trustees are so unwilling to execute the trust in conformity with the decree thus interpreted, that they prefer to be removed rather than be the agents of its execution. As the trust has been entirely unexecuted for a long time, and the society has constantly been in pressing need of the money, and there is no reason to believe that these trustees will change their opinions, it becomes necessary to remove them. Of the power of the court to do this, there is no doubt. The other three trustees, namely, Messrs. Garrison, Quincy and May, are willing and ready to execute the trust by paying over the whole fund to the treasurer of the society. No reason is suggested why such an execution of the trust would not be discreet, if the whole fund is to be appropriated to the enterprise in which the society is engaged.

It is not necessary to notice the past doings or language or motives of the several members of the board of trustees, except so far as they show that the trust has been in no part executed and is not likely to be executed by the present board, and that there is a necessity for removing those who are unwilling to execute the trust in conformity with the decree, and for appointing others in their place.

*Decree for the removal of the four trustees, and for the nomination of persons to fill vacancies.*