FRANK E. HEALY, ATTORNEY-GENERAL OF THE STATE
OF CONNECTICUT, *vs.* THE LOOMIS INSTITUTE ET ALS.

First Judicial District, Hartford, January Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and KELLOGG, Js.

When an error is claimed in a ruling on evidence, our practice re-
quires that the finding as to this ruling shall contain, among
other things, enough of the relevant facts preceding the offer
in question to show the circumstances under which the ruling
was made.

The controlling question in the present case was whether the charter
of the Loomis Institute—a charitable educational corporation
organized in 1874 to carry out a family compact among four
brothers ·and a sister of the Loomis family to bequeath the
residues of their respective estates to the school—required the
trustees, as a matter of law, to provide for the education of
girls as well as boys. The trial court excluded the wills of the
donors, which were offered by the plaintiff solely as an aid in
the construction of the charter. *Held* that the wills should have
been admitted for this purpose, because they, the charter, and
the family compact, were all parts of a common plan.

The charter of a charitable corporation will be construed liberally
to carry out the intention of the donor.

Neither the charter, which referred in most instances to the educa-
tion of "all persons," nor any of the wills, expressly restricted
the school to boys; one of the wills made a specific mention of
girls and the section of the charter relating to examinations for
admission contained the phrase "he or she"; and the only order
of selection designated in the charter was "first, from those
belonging to the Loomis family by name or consanguinity, next
from those belonging to the town of Windsor, next from those
belonging to the State of Connecticut, and next from those
deemed most worthy, without regard to the State or nation,"
and this order of selection represented the undoubted purposes
of these founders. *Held* that the charter required the trustees
to extend the educational benefits of the school to girls to be
chosen from the designated classes—a construction persuasively
supported by their own practical interpretation in maintaining a
department for girls for a period of nine years after the opening
of the school in 1913.

The girls' department thus established by the trustees was so poorly
attended and the resulting cost of instruction so disproportion-

ately high, together with the rapid growth of the boys' department and the fact that of late years the Institute found its fund limited, that the trustees in 1923 suspended its operation, it being their intention to institute a separate school for girls as soon as the financial condition would warrant the setting aside of sufficient funds for the erection of a separate girls' school. The trial court concluded that the trustees "exercised a wise discretion." *Held*:

1. That this finding as to discretion was a conclusion and reviewable.

2. That the trial court erred, since mere considerations of excessive cost could not justify the trustees in such a radical and, for all that appeared, indefinitely prolonged departure from the positive duty imposed upon them by the charter; and that their discretion with respect to the girls' department was limited to matters connected with its internal administration—for example, as to whether they should conduct a coeducational institution, or a department in the Institute for girls.

Whether the trustees would have the power to establish a school for girls in another location in Windsor, *quære*.

The trustees of a charitable corporation do not, as such, succeed to the visitorial powers of the founder of the charity; their power is derived only from the corporate charter, their duty is defined in the same instrument, and for an abuse of the one or an evasion of the other they are at all times subject to the control of courts of equitable jurisdiction.

A suit by the Attorney-General for injunctive relief, is a proper remedy to compel the trustees of a charitable corporation to obey the terms of its charter.

Argued January 7th—decided April 22d, 1925.

SUIT for an injunction to restrain the Loomis Institute, a charitable corporation, and its trustees from continuing certain alleged violations of its corporate charter, and for other equitable relief, brought to the Superior Court in Hartford County and tried to the court, *Jennings, J.;* judgment rendered for the defendants, and appeal by the plaintiff. *Error; cause remanded and decree directed for plaintiff.*

The Loomis Institute is a charitable corporation specially chartered by the State in 1874, as an educational institute constituted and established for the free and gratuitous education of all persons between

the ages of twelve and twenty. The Institute is endowed chiefly from legacies under the wills of James C., Hezekiah B., Osbert B. and James L. Loomis, and Abby L. Hayden, four brothers and one sister, who were named as incorporators and trustees in the original charter. The town of Windsor has always been represented on the board of trustees by at least two members and usually by three. In 1912 a tentative plan was adopted and the first and most necessary building unit undertaken. The building program as outlined is nearly complete and is in successful operation. It was designed only for boy boarders. The funds of the Institute were inadequate to duplicate this plant for girl boarders. The trustees have always considered it inadvisable and contrary to the best interests of the Institute and of society as expressed in the purposes of the charter, to take both boy and girl boarders in the existing buildings and on the limited site of the Institute, and the trustees decided to take boys as boarders and not girls. The cost of food and lodging to a boy per year is $700, and a small weekly charge is made to day pupils for their noon meal. Boarding pupils come from outside Windsor. From the opening of the school in 1914, it was the purpose of the trustees to maintain a school for both boys and girls. In selecting pupils the trustees have followed the order of selection prescribed in the charter, viz.: "In case a greater number of persons having the requisite qualifications shall apply for admission than the Institute can accommodate, then selection from said applicants shall be made, first from those belonging to the Loomis family by name or consanguinity, next from those belonging to the town of Windsor, next from those belonging to the State of Connecticut, and next from those deemed most worthy, without regard to State or nation." Because of the high type of school and the fact that

tuition is free, larger numbers of pupils applied than could be accommodated with the funds at hand, and some method of selection is essential.

The school was opened for boys and girls and so continued for nine years until 1923. The accommodations and opportunities offered to girls were superior to those offered to boys, except that girls were not admitted as boarding pupils. The domestic science course provided for girls was not availed of by the girls attending the school, and for that reason had to be given up a few years ago. The trustees were disappointed in the number of girls applying for admission. In spite of the excellent educational opportunities offered to girls, only twelve girls graduated from the school during the nine years that the girls' department was in operation. The boys' department, on the other hand, proved popular from the first and has been growing rapidly and greatly. The practical result was that the girls' department really amounted to private tuition and tutoring for the few girls who desired to avail themselves of the facilities offered, at a high and disproportionate per capita expense. During the past few years, largely as a result of the world war, the Institute has been sailing financially close to the wind. The trustees felt that they had given to the girls of Windsor and vicinity a fair opportunity to enroll and that they had not seen fit to do so except in disappointingly small numbers, and that they were not justified for the present in continuing to use the funds of the Institute in offering courses to girls. On February 16th, 1923, the trustees voted "to suspend the instruction of girls at the close of the present school year," and suspended such instruction at the close of the school year in June, 1923. At this time there were fifteen girls in attendance. It is the intention of the trustees that the present suspension of the girls' department shall be tem-

porary. It is their intention as soon as the financial condition will permit, to immediately start setting aside a fund to be used for the erection and maintenance of a separate girls' school, preferably in a location in Windsor other than the present site of the school, if an amendment to the charter can be obtained to acquire such other site. The trustees in suspending the girls' department for the present and under present conditions have exercised a wise discretion. The educational opportunities have always been free to all pupils.

The court reached the following conclusions, which are assigned in the reasons of appeal and pursued in argument: "(1) that the charter does not, as a matter of law, require the trustees to maintain either a girls' department or a coeducational institution; (2) that upon the facts established this court should not interfere in the internal management of the Loomis Institute or attempt to control the discretion of the trustees in the internal management of said Institution."

*Hugh M. Alcorn* and *A. Storrs Campbell,* for the appellant (plaintiff).

*John T. Robinson* and *Lucius F. Robinson,* for the appellees (defendants).

WHEELER, C. J. Before considering the conclusions reached by the court, we shall dispose of the ruling on evidence. Nothing appears in the finding but an excerpt from the stenographic record containing the objection to the offer, the claims made in support of the offer, and the ruling of the court. The relevant facts preceding the offer are not given. Counsel have discussed this offer as if these facts were stated in the claims made and as if they had been stated in accord-

ance with the rule.  Practice Book, p. 272, § 133.  We will dispose of this ruling upon the same assumption. Certain members of the Loomis family comprising four brothers and one sister, made a family compact by which they agreed to leave their estates by will for the purpose of founding the Loomis Institute.  Pursuant to this compact these members procured from the General Assembly in 1874, an Act of incorporation for this Institute, which provided that the Institute should furnish free and gratuitous instruction for "all persons" between the ages of twelve and twenty-one, "but no person shall be admitted as a student in said Institute until he or she shall" be adjudged, on examination, to possess certain educational qualifications.  These four brothers and one sister were named as incorporators and trustees in the original charter.

Plaintiff's offer was based upon the claim that the defendants, in defiance of the charter and wills, have voted and excluded girls from attending the Institute. The wills of these five incorporators were offered in interpretation of the charter and to show the proper construction to be placed on the charter.  The defendants objected to the admission of the wills, because they were irrelevant and immaterial, the precise basis for this claim not appearing.  The court excluded the offer upon the ground that the authority of the trustees was to be determined by the charter provisions.  That was not the purpose of the offer, which was to use the wills as an aid in the construction of the charter.

The question at issue is whether the charter requires the trustees to educate boys and girls in the Loomis Institute.  Most of the references in the charter are to the education of all persons.  In only one instance does it refer to the students of the Institute as of both sexes. None of the wills, except that of John Mason Loomis, refers to the student body of the Institute being com-

posed of both boys and girls. This indicates the intention of this testator, and since he was one of the makers of the family compact, and the charter was obtained in carrying out the compact, and he was an incorporator and trustee from the beginning to his death in 1900, it tends to show that this will and the charter expressed the same purpose. It was clearly admissible as proof of what the proper charter construction should be. The other wills made no specific reference to this subject. The charter provided for the education of all persons between certain ages. The fact that these wills did not restrict the student body to males is some evidence of the proper construction to place on the charter. In addition, the family compact, the charter, and the wills, were all a part of a common plan, and are facts to be considered together when the construction of the charter is in question.

We take up the first conclusion reached by the trial court, that the charter does not require the trustees to maintain either a girls' department or a coeducational institution. In every section of the charter the reference to those who are to be benefited is to "persons," and in no instance is there a limitation of the sex of the persons to be benefited. This fact, coupled with the undoubted purpose of these founders to benefit all who might belong to the Loomis name and all who belonged to the town of Windsor without discrimination, would make obligatory the construction of "persons" to include those of both sexes. The charter refers to the descendants of the Loomis family. There is no indication in the terms of the charter, or from the context, that these descendants were limited to males. So, in the charter, the use of family is inclusive, not exclusive. These considerations lead strongly to the conclusion that these founders intended the benefits of this Institute for both males and females, for all de-

scendants and members of the Loomis family without discrimination of sex.

The finding is explicit, "from the first opening of the school it was the purpose of the trustees to maintain a school for both boys and girls." This practical construction of the charter by the successors to the founders, for a period of nine years, is persuasive evidence of the correctness of their interpretation. One of the founders was Mrs. Hayden, a sister of the other four founders. In view of the common purpose of all these founders, it is not probable that Mrs. Hayden consented to the obtaining of a charter which excluded girls from the privileges of this Institute. Satisfying as these considerations are, an even more persuasive and conclusive consideration is found in the language of § 2: "But no person shall be admitted as a student in said Institute until he or she shall be adjudged, on examination, capable," etc. Manifestly this is a direct reference to boy and girl students. The charter vests in the trustees the selection of the individual student. It does not give them the power to discriminate between the classes of students whom the Institute should serve. If there were doubt concerning the language of the charter as to the persons whom the Institute should receive as pupils, it should be resolved liberally in order to carry out the charitable purpose of the donor as effectually as possible. *First Congregational Soc.* v. *Bridgeport,* 99 Conn. 22, 121 Atl. 77; 2 Sutherland on Statutory Construction, § 555.

The charter plainly requires the trustees to furnish to girls the educational benefits of the Institute. Whether the trustees should carry out this purpose by conducting a coeducational institution, or by a department in the Institute conducted for girls, should be left to the reasonable discretion of the trustees. Whether the trustees, under the charter, would have the power

to establish a school for girls in another location in Windsor, as has been suggested to be the ultimate purpose of the trustees, we leave undecided.

The court has found that "the trustees, in suspending the girls' department for the present and under present conditions, have exercised a wise discretion." This latter statement is a conclusion and not a finding of a fact, and hence is reviewable. \The findings that the Institute found its income limited of late years, and the disappointingly small enrollment of girls, and the excessive cost of maintaining the girls' department, together with the rapid growth of the boys' department, are obviously the reasons which led the trustees to feel that they were not justified for the present in continuing to use the funds of the Institute in offering courses to girls and to vote to suspend the instruction to girls.

The court has also found that\"it is the intention of the trustees that the present suspension of the girls' department shall be only temporary. It is their intention as soon as the financial condition will permit to immediately start setting aside a fund to be used for the erection and maintenance of a separate girls' school preferably on a location in the town of Windsor other than the present site of the school," if charter power to acquire such other site can be obtained. The temporary character of this suspension must be judged by these subordinate facts. As soon as their straightened financial condition will permit, the trustees say they purpose raising a fund for the erection and maintenance of a separate girls' school. When the Institute will be able to begin setting aside this fund does not appear, nor does it appear what such a building will cost equipped, nor within what time this fund would be at the disposal of the Institute. It is perfectly obvious from this finding that the date when the trus-

tees will reopen the girls' department of the Institute is problematical, and at best is remote in time.

The trial court reached, as its second conclusion, that upon the facts found the court should not interfere with the internal management of the Institute or attempt to control the discretion of the trustees in the internal management of the Institute. So that the immediate question is whether the trustees can suspend the girls' department, not for some immediate emergency, but chiefly because of its undue cost, and for an indefinite time. The defendants claim that the court has found against the plaintiff upon the merits, and, further, that the Superior Court does not possess the power of restraining and directing the trustees in respect to the management and control of the internal affairs of the Institute. The first of these claims evidently rests upon the court's finding that the trustees have exercised a wise discretion in their suspension of the girls' department. This, as we have said, is not a finding of fact, but a conclusion from subordinate facts, and reviewable. We shall postpone its consideration until we have determined the jurisdictional question of whether the Superior Court, on the facts, had power to prevent the suspension of the girls' department. Our equity court's powers over a charitable corporation come from our statute of charitable uses and from the general equitable power found in the constitution of that court. In a general sense it is true that "the common law of England in regard to the visitation of eleemosynary institutions" is a part of our common law. Where the charity originated in private bounty, the visitorial power was in the donor, and at his death in his heirs, with the power of appointing a visitor in his stead. The founder and the visitor of a charitable foundation not incorporated, has the power of appointing a visitor in his stead. Whether or not he could do

this in the case of a corporation, we do not now determine. It is said that where the charity is incorporated and trustees named, they succeed to all the powers of the founder or visitor, and, upon this principle, the trustees in this case have complete control of the internal affairs of the Institute and can determine, at their discretion, whether the charity shall be suspended or not. In a case whose facts are not° unlike the case before us, *Fuller* v. *Plainfield Academic School,* 6 Conn. 532, 544, a school had been established by individual effort and maintained by subscriptions. The founders sought and obtained from the General Assembly an Act of incorporation, in which certain persons were named as trustees with power to fill vacancies. The plaintiff had been deposed as trustee and he brought a writ of mandamus to restore himself to his office of trustee. We quote from the opinion: "The first objection taken to the interference of the Superior Court is, that this being an eleemosynary corporation of private endowment, it belongs to those who hold the visitatorial power to controul these trustees, and not to this court. That this is an eleemosynary institution for the purpose of dispensing charity, in the education of children, is true. . . . That the founders of it might have appointed visitors to controul it, is not denied; but they did not, unless these trustees are visitors. On the contrary, they solicited of the General Assembly the establishment of a corporation, with powers to manage all its concerns. The General Assembly granted their request; and the trustees appointed under that Act, were part, at least, if not the whole, of the original founders. The corporation, then, is the creature of the law; and possesses such powers as the legislature conferred on it, with incidental powers to execute those given. The original founders are merged in the corporation; and henceforth it is to be subject

only to the general law of the land. Neither the original founders, nor the General Assembly can rightfully exercise any authority over it, by exerting a controul over the trustees, or appointing visitors for that purpose. . . . If this doctrine be correct, then this corporation is uncontroulable, except by the laws of the land, to be administered by competent tribunals. Can then, these trustees visit themselves; be visitors and visited? I think not, on the ground of authority. *The King* v. *Bishop of Ely,* 2 Term Rep. 338, 339; *The King* v. *Bishop of Chester,* 2 Stra. 797. It appears to me also, that there is an intrinsic difficulty in supposing the visitatorial power vested in the body of trustees to be exercised over and toward each other." It is sometimes held that the trustees of a charitable corporation are in succession to the founders and succeed to their visitorial powers. We have adopted the doctrine that the trustees exercise the powers conferred upon them by the General Assembly and are subject to the law of the land. We refused to accept the theory of visitorial power, and upon grounds of public policy. Elliott on Private Corporations (4th Ed.) § 90, states the position of this court: "The present power of control over corporations is founded more on grounds of public policy than on any theory of succession to the rights of a prehistoric founder." See also 2 Beach on Private Corporations (1st Ed.) § 831. Mr. Justice Bradley announced the view of the United States Supreme Court in these words: "When a charitable trust has been fully constituted, and the funds have passed out of the hands and control of the donors, and into the hands of the proper institution, or organization, intended for its administration, the Court of Chancery, or some analogous jurisdiction, becomes its legal guardian and protector, and will take care that the objects of the trust are duly pursued, and the funds rightfully appropri-

ated. But where contributions to a charity are proposed to be made upon certain express conditions, the rights of the donors stand upon contract; and if the conditions are not performed, their obligation is discharged." *Printing House* v. *Trustees,* 104 U. S. 711, 727. The same court said, in *United States* v. *Union Pacific R. Co.,* 98 U. S. 569, 617: "Where municipal, charitable, religious, or eleemosynary corporations, public in their character, had abused their franchises, prevented the purpose of their organization, or misappropriated their funds, and as they, from the nature of their corporate functions, were more or less under government supervision, the Attorney-General proceeded against them to obtain correction of the abuse." Again, in *United States* v. *World's Columbian Exposition,* 56 Fed. 630, 646, the court stated: "A court of chancery has inherent jurisdiction to see to it that the gift is applied in the manner designated by the donor, and that the conditions of the gift are observed by the donee." See also *Printing House* v. *Trustees,* 104 U. S. 711, 727. Perry on Trusts (6th Ed.) § 744, states the rule to be: "If the trustees of a charity abuse the trust, misemploy the charity fund, or commit a breach of the trust, the property does not revert to the heir or legal representative of the donor, unless there is an express condition of the gift that it shall revert to the donor or his heirs, in case the trust is abused; but the redress is by bill or information by the Attorney-General or other person having the right to sue." See also *MacKenzie* v. *Trustees of Presbytery of Jersey City,* 67 N. J. Eq. 652, 671, 61 Atl. 1027. So that if the trustees do not pursue the objects of the charity, or abuse the charity by violating its franchises, its charter or Act of incorporation, or the conditions attached to it, or by the perversion of its funds, the court of chancery will intervene and compel the

trustees to establish or execute the trust in accordance with their power under the charter or Act of incorporation and in accordance with the law of the land. The Attorney-General is the proper person to have brought this action, and the bill in equity a proper remedy. *Proprietors of White School House* v. *Post*, 31 Conn. 240; *Attorney-General* v. *Garrison*, 101 Mass. 223; *United States* v. *Union Pacific R. Co.*, 98 U. S. 569, 617; 11 Corpus Juris, p. 366.

The case resolves itself to this: Have these trustees power to suspend the girls' department, under their charter and upon the facts found? Their right to manage this charity so long as they act within their powers in the execution of the trust, cannot be doubted. They have no visitorial powers as such. Their powers are determined by the law of the land. We do not doubt their right to determine whether the Institute shall be conducted on a coeducational plan or by separate boys' and girls' departments, or by excluding girl boarders. Whether the trustees would have power to erect and maintain a separate girls' school in a location other than the present location—the Island—as we have before said, we leave undecided. The time when the Institute would be in a position to build a girls' school is too remote to make this a problem for present determination.

Since the charter requires these trustees to maintain a girls' school as well as a boys' school, they have no power to suspend the girls' school because its limited attendance causes an excessive expenditure per pupil. If this were an adequate ground for their action, they might suspend indefinitely such department, and in the exercise of the same power they might suspend indefinitely the boys' school and conduct a school exclusively for girls. The question is not one of visitorial powers, but one to be determined by the construction

of the charter.  Unless we are to read into the charter a provision that these trustees may suspend at their discretion the girls' department of the Institute, their power of suspension cannot be found in the charter.  We cannot read such a provision into the charter.  To do so would plainly defeat the purpose of the founders.  The charter determines the kind of an Institute the founders were establishing, and it is the duty of these trustees, in administering the public charity committed to their keeping, to carry into execution the provisions of the charter and the will of the founders, not the Institute they themselves might have founded, but that which the founders established. They must at all times remember that they are administering a public charity "constituted and established for the free and gratuitous education" of boys and girls. Further, that these founders, while committing the selection of applicants for admission to the Institute when they shall exceed the accommodations, expressly determined and provided the classes, and the order of classes, from which the selections should be made: "first from those belonging to the Loomis family by name or consanguinity, next from those belonging to the town of Windsor, next from those belonging to the State of Connecticut, and next from those deemed most worthy, without regard to State or nation."  It may with verity be said that the chief purpose of these founders was to establish and maintain an Institute for the free and gratuitous education of all boys and girls belonging to the Loomis family and all boys and girls of the town of Windsor.  These purposes the trustees cannot be permitted to depart from.  Their powers are ample under the charter and the law of the land to carry out the purposes of the founders.  Their discretion is not uncontrollable.  When they depart from the authority given them in the charter, they

abuse the discretion vested in them, and upon proper application the court of chancery will check them in their illegal course and thus preserve unbroken the charter, which is the guide for the trustees and at the same time the embodiment of the wishes and will of the founders.

There is error, the case is remanded with direction to the Superior Court to enter its decree for plaintiff in accordance with prayer one and this opinion.

In this opinion the other judges concurred, except KELLOGG, J., who concurred in the result, but died before the opinion was written.