INSTITUTE OF LIVING
*vs.*
BOARD OF TAX REVIEW, HARTFORD

Court of Common Pleas    Hartford County    File No. 43836

## MEMORANDUM FILED AUGUST 22, 1945

*Robinson, Robinson & Cole,* of Hartford, for the Plaintiff.

*Frank Covello* and *Samuel H. Aron,* of Hartford, for the Board of Tax Review.

PICKETT, J. It is conceded that from 1822, when the plaintiff was specially chartered by the Legislature, until December 22, 1943, "the Institute has never paid or been compelled to pay local property taxes of any kind in Hartford, and its properties in said town have never been included on the grand list of taxable property" (except for a few years on the Washington School District list under a special legislative provision).

It is also conceded that the Institute has consistently claimed exemption from city and town taxes and has duly filed its claim for exemption on forms prescribed by the Tax Commissioner of the State in manner and time as provided by statute.

It is alleged and admitted that by vote of December 22, 1943, the Board of Tax Review, after due hearing, voted to place the properties of the plaintiff on the list of taxable properties of the city, whereupon the Board of Assessors included such property in the grand list of July 1, 1943, in the amount of $1,484,140 at a tax rate of 30½ mills.

It is from this action of the Board of Tax Review that plaintiff appeals.

The now outstanding and controlling provision of plaintiff's special charter as it relates to tax liability or exemption is: "Any estate so held shall be subject to taxation and entitled to tax exemption only in accordance with the provisions of the general statutes" (Special Laws of 1927, No. 379, p. 390.)

Thus it is clear and conceded that plaintiff's status for purposes of taxation is controlled by section 1163 of the General Statutes, Revision of 1930, and such special exemptions or inclusions as from time to time were enacted in the various amendments to plaintiff's charter are not the law of the case but only a part of the historic background of the institution and to a more or less extent evidential of the policy of the State toward it.

Plaintiff claims exemption under subdivision (7) of section 1163 of the General Statutes. Defendant claims that as matter of fact plaintiff does not meet the conditions of subdivision (7) in any event and further that subdivision (7) is not applicable to the plaintiff's status, even if all that is claimed, but that the only hospital exemption granted by the statute is to hospitals receiving regular State grants. Defendant's brief baldly states the proposition: "It is our claim that no hospital is entitled to exemption under this statute unless it is supported wholly or in part by state appropriations."

It is defendant's further claim that subdivision (7) of section 1163 does not apply to any hospital and that only subsection (14) of the act grants any tax exemption to hospitals.

If this contention is true the plaintiff is at once out of court for it appears in evidence that the State does not now and has not for many years contributed by appropriation to the support of the Institute. Furthermore the Institute has based its claim for exemption before the assessors, the Board of Tax Review and the court solely on subdivision (7).

It is appropriate, therefore to deal with this claim at the outset.

Section 1163 and the various legislative acts from which it culminates, contain a lengthy list of property of various kinds, uses and ownership which are defined as tax exempt either in toto or up to stated values. I regard these as categories, not exclusions. That property which falls within any of the stated categories is exempt under the statute. The mere fact that a State-aided hospital is specifically exempted does not exclude a non-State-aided hospital which qualifies under some other category defined in the statute.

In *Boardman vs. Burlingame,* 123 Conn. 646, the Supreme Court of Errors had before it an action against this plaintiff

Institute. To be sure the issue did not involve tax exemption. It did, however, involve the question of tort liability or exemption therefrom by a charitable institution. The court held, at page 653, "Reasonable men could come to no other conclusion on the evidence than that the Retreat is a charitable institution and it was entitled to the substance of the charge requested. The test applied in *Canterbury School Inc.* v. *New Milford,* 111 Conn. 203, 149 Atl. 685, as suggested by the plaintiff, referred to the sense in which the Legislature used a carefully drawn definition of a tax exempt institution. If this test is insisted on, it appears that this institution is tax exempt. The question of tax exemption is not in issue here, however, and the testimony is uncontradicted that the Retreat is organized and operated for the public welfare without profit to itself or any individual. The mere fact that some patients pay for part or all of their care does not destroy its charitable character. *Yale University* v. *New Haven,* 71 Conn. 316, 328, 42 Atl. 87."

The language above quoted does not of course determine the factual issue now before the court. It does clearly indicate that on the facts then before the Supreme Court of Errors the plaintiff Institute fell within the category of a charitable corporation as defined by the statute and by necessary implication the statute covers not merely State-aided hospitals but any hospital which meets the test of subsection (7). I so hold and cite further *Brown, State's Attorney ex rel. Gray vs. Quintilian,* 121 Conn. 300, 304; *St. Alban's Hospital vs. Town of Enosburg,* 96 Vt. 389, 120 Atl. 97.

Since the court holds that subdivision (7) is a category which includes hospitals if so organized and conducted as to meet the statutory conditions, it is convenient to state the conditions to be met by the plaintiff to entitle it to exemption and consider whether those conditions are in fact met.

The conditions stated in section 1163, subdivision (7), are three, which may be concisely stated as: (1) that the Institute is a Connecticut corporation organized exclusively for scientific, educational or charitable purposes, or for two or more of such purposes; (2) that its property is used exclusively for carrying out one or more of such purposes; and (3) that no officer, member or employee receives or at any future time shall receive any pecuniary profit from the operation thereof except reasonable compensation for services.

Plaintiff is a Connecticut corporation. It was first chartered by special legislative act in 1822. Its charter has from time to time been amended but it has at all times been a Connecticut corporation operating under legislative special act and charter. Thus one requirement of the statute is met.

The next element to be considered is, for what purpose was it organized? The evidence establishes that: "In May 1821 the attention of the President and Fellows of the Connecticut Medical Society was directed to the helpless condition of the insane and their families. The members of that Society knew full well that insanity, at all times a fearful malady had been for many years extending its ravages. They knew also that its treatment is attended with difficulties which neither ingenuity or perseverance on their part are sufficient to remove nor did they hesitate to adopt such measures as promised to relieve themselves of embarrassment, and to give their patients better prospect of recovery.

"The subject was referred to a committee who reported in favor of a Public Asylum to be established on humane principles and superintended by a Society of Patrons." (Plaintiff's Exhibit A.)

As a result of the investigations, solicitations and petitions of men eminent in their day in the medical and other professions, contributions were obtained and the General Assembly held at New Haven in May of 1822 "upon the petition of Thomas Hubbard and others showing that there are more than One Thousand Insane persons in the state; that a subscription has opened to provide them an Asylum or Retreat to mitigate their sufferings and restore them to reason; praying for an act of Incorporation, and a grant from the Treasury in aid of the Benovolent object, as by petition on file appears", granted to the petitioners a special charter "to be forever hereafter one body politic and corporate" under the name and style of "The President and Directors of the Retreat for the Insane."

The act further provided that membership in the corporation should consist of "subscribers whose benefactions shall amount to either of the subsequent sums": $20 — life members; $12 — members for 10 years; $2 — members for one year or annually so long as they paid $2 per year and certain other contributors.

There was included in this act a provision as follows: ".... that in aid of the benevolent object of said Institution there

shall be paid to said corporation upon an order of the Controller of Public Accounts (which order the Controller is hereby authorized and directed to draw), the sum of Five Thousand Dollars out of the Public Treasury whenever (if within two years) Fifteen Thousand Dollars exclusive of this grant shall have been subscribed and Ten Thousand Dollars actually paid to said corporation.

"And the governor of this state is hereby authorized and requested to grant a brief annually for Five Years soliciting contributions for the benefit of said Institution and to issue proclamation accordingly."

The General Assembly of 1824 repealed the charter of 1822, granted a new and somewhat briefer one, making no mention of the qualifications for membership, providing that "The governor for the time being, with two other commissioners, to be appointed by the General Assembly, shall superintend the general concerns of said institution and make such occasional visits to the Hospital, as they may deem expedient", and further validating all acts done under the first charter and declaring "that the corporation established by this act shall be considered and holden to be the same corporation to all intents and purposes."

The picture so drawn becomes complete when we find that some $19,000 was raised by subscription from citizens of almost every town in the State, that money was received from citizens of Rhode Island, Massachusetts, Vermont, and New Hampshire; that nearly $4,000 was subscribed by residents of Hartford on condition that the Retreat be located in Hartford; that this condition was accepted, the present site selected and purchased and the Retreat built, dedicated and opened for service.

It appears clearly that all of the money originally used to launch this Retreat for the Insane was donated by private citizens or appropriated by the State, and that the corporation was at its inception a non-stock, non-profit, benevolent corporation with its purpose to care for and if possible cure the mentally ill and its property sequestered to that purpose solely.

The charter of 1822 specifically authorized the "Prudential Committee" "to regulate the economical and financial concerns of the Institution and determine upon what terms the patients are admitted" and contained further provisos that "any sub-

scriber paying Two Hundred Dollars may at all times name one indigent patient who is to be received into the asylum upon the most favorable terms", and the same privilege accrued to "any town, corporate body or association of individuals paying Two Hundred and Fifty Dollars."

The charter of 1824 does not contain these provisions, nor do they appear in subsequent amendments.

The general history of the corporation, the various amendments to its charter, and many pertinent facts developed in evidence are well and fairly stated on pages 2 through 15 of the plaintiff's brief, which the court adopts in substance and includes in this memorandum by reference.*

It is sufficient to here state that the Institute was founded for a benevolent purpose, financed at the outset by donations and public grants, built under the supervision of the Governor and commissioners appointed by the State, managed by members, directors, "Patrons" and public spirited persons who received neither compensation, dividends, stock nor profit, never could and never expected to.

Such in brief is the genesis of the Institute and clearly it was organized solely to care for and cure the mentally ill and serve a benevolent and useful purpose in the State without profit to any one other than reasonable compensation to those employed to execute its purposes.

The Retreat or Asylum was a pioneer in the field. None then existed in the State and only one other in the country.

That the General Assembly not only gave the corporation a special charter, but made several appropriations to aid it, and authorized the Governor and appointed commissioners to participate in its inception appears to be the first recognition by the State of public concern for those unfortunates whose minds are affected. The concern so manifested in 1822 has developed into an ever-broadening public policy as manifested by the constant demand for new State institutions, which the Legislature from session to session is called upon to consider and to some extent meet.

The court has no hesitancy in declaring that as organized and for over a century operated, the Institute or Retreat was definitely the type of corporation contemplated by our tax exemption statute.

* See post p. 384.

It is the claim of the defendant, however, that the Institute as now conducted has abandoned its original purpose and so far embarked on a new course of conduct as no longer to meet the test of the statute. Here is the real crux of the matter before the court. It calls for full and serious examination.

It appears in evidence that about 1931 the "Retreat" as it was then known had reached a low ebb financially and physically. Mr. Howell Cheney, a present and active member of the corporation, and a director, testified that shortly prior to 1931 "I resigned because I became convinced the institution was slipping, was going down hill, had adopted a defeatist attitude. They were running deficits, were under the pressure of severe crippling economies and they were not making progress."

Another witness described the place as a "morgue", not literally such of course but figuratively a moribund enterprise.

The then board of directors undertook to revivify an institution which for over a century had served a valuable purpose. The present psychiatrist-in-chief, Dr. Burlingame, was appointed. He undertook the task of reorganization. He made many changes with the support and approval of the board of directors.

The physical plant was renovated, modernized and enlarged. The equipment and facilities were increased and modernized. The staff was increased and a high quality of professional men procured; a school of nursing to specialize in the care of the mentally ill was developed; extensive laboratory and research work was undertaken, pioneer work, original and in collaboration with both State and other institutions was undertaken especially in connection with so-called "shock treatment"; the Institute regained recognition by The College of Physicians and Surgeons; its courses in nursing were accepted by Columbia University, the University of Connecticut, and Wesleyan University as credits toward degrees; the Institute collects, analyses, digests and redistributes current literature in the field of mental ailments, but primarily it continues as a place for treatment and cure of the mentally ill.

During the twelve-year period from 1931 to 1943 the Institute has not only expanded and improved its physical plant but has at the same time achieved a surplus of income over operating expense, all of which surplus has either been expended on plant and equipment enlargement or improvement or earmarked for such purpose when world conditions permit.

The defendant insists that this success amounts to a departure from the original and fundamental purposes of the corporation and so changes its character that it is no longer within the terms of the exemption statute.

The evidence before the court justifies the belief that the facilities offered by the Institute are excellent even to the extent of being luxuriant. It is quite clear that persons able to pay generously may, if their mental condition makes it safe, have accommodations approximating the privacy of their own home. It is likewise true that the accommodations and facilities available to the average patient are attractive and comfortable and that a very substantial number of persons are received gratis or at nominal rates. It is testified that no Connecticut resident, recommended by a physician, and whose mental condition was such that cure or improvement seemed reasonably possible, has even been turned away because he could either pay nothing or only a little.

While it is true that slightly more than half the patients come from out of the State it is testified that priority is always given to Connecticut residents. Also, the charges to Connecticut residents are less than those to non-residents.

It is urged that Dr. Burlingame is rather generously compensated. In the light of what he has accomplished at the Institute, professionally and managerially, it would not appear that the eminent and widely experienced board of directors have either misjudged his worth or voted him an unreasonable compensation.

Basically the fact remains that the Institute, now as always is organized solely for the care and treatment of the mentally ill and incidentally, or rather as an integral part of that purpose, carries on scientific research and educational work, each element contributing to the ultimate purpose of combatting the horrible toll of mental disorders. It is notable that in the compiled list of occupations of patients (Plaintiff's Exhibit R) for the year 1942, they come not only from all walks of life but a very substantial proportion are factory workers and mechanics.

I conclude that the Institute is "organized exclusively for scientific, educational" and "charitable purposes" within the intendment of the statute, and that its funds and property are held and used exclusively for such purposes.

There remains the question whether any officer, member or employee does or at any future time can receive any pecuniary profit from the operation thereof except reasonable compensation.

As to this it has already been noted that the original funds came in part from private subscription and in part from legislative grants, later augmented by small State appropriations. It also appears in evidence that from time to time there have been gifts and bequests of substantial sums, some for specific and some for the general purposes of the corporation. It further appears that the corporation now has on hand in the general fund $354,196, in a special fund $141,586, in a research lectureship fund $2,500 and in an unallocated fund $2,000; that is, some $500,000 in gifts for the sole purpose of promoting the work of the institution as a public benefaction. In short, a substantial part of the property and equipment of the Institute together with the moneys above mentioned are funds and property impressed with a trust for the specific purposes of the corporation.

Neither the members, directors or officers of the corporation have, or have ever claimed the right, to draw dividends or distribute profits. The corporation is not and never has been a joint stock corporation or a non-stock corporation with power to share in profits.

Were the corporation dissolved tomorrow no member would be entitled to a distributive share in its assets.

This fact the corporation itself has recognized by an appropriate by-law which provides: "All the property and income of the corporation shall forever remain for and be exclusively devoted to the prevention of illness, the cure, care, treatment, and assistance of the mentally, or nervously ill and the guest or patients of the institution, and the training, education or assistance of individuals, or groups who have similar aims. No director, officer, member or employee of the corporation shall at any time receive any pecuniary profit from the corporation except reasonable compensation for services or as a proper beneficiary of the care and treatment afforded by the institution."

As is held in *Asylum vs. Phoenix Bank*, 4 Conn. 172, 177: "The *Asylum*, in no sense of the expression, is a money-making institution. All its funds are necessarily applicable to the charitable object of educating the deaf and dumb; and this is

done gratuitously, except so far as the power of doing is enlarged, by the sums paid for instruction, by the rich and able. By this operation, the funds of the institution are not absorbed, but augmented; the charitable object of the *Asylum* is not diminished, but promoted; and the nature of it is not changed, but pursued. The funds of the institution are not applicable to any but eleemosynary purposes, nor have they been otherwise applied. If they had, it would have constituted a breach of trust, for which there is a most obvious remedy. And as the trustees are alone authorized to act for the promotion of the benevolent object of the institution; so the donors are, in no event, entitled to any profit, which might arise, from the enlargement of its funds. Be they greater or less, they are consecrated to charity; and this decisively marks the eleemosynary character of the institution." *See, also, Healy vs. Loomis Institute,* 102 Conn. 410, 422; *Arnold College vs. Danaher,* 131 *id.* 503, 506, 510.

All that the plaintiff Institute has by way of property or funds has accrued either from grants, gifts, bequests or the operating income to a large extent made possible by the generosity of givers. Surely no part of this is the property of or a gift to the individual members.

Defendant's claim is that this corporation is a non-stock corporation controlled by the decision in *Canterbury School, Inc. vs. New Milford,* 111 Conn. 203. This claim is overruled.

The doctrine stated in *Blodgett vs. Bridgeport City Trust Co.,* 115 Conn. 127, 136, applies to this case. I hold that the plaintiff corporation neither in terms or by implication is within the intendment of the statute authorizing non-stock corporations for limited purposes but having the implied right to make "an incidental profit without any limitation upon its authority to distribute those profits among its members." *Blodgett vs. Bridgeport City Trust Co., supra,* p. 136. On the contrary, the statement in the cited case, on page 136, to the effect that "these are institutions of a strictly public character and it is impossible to find in their chartered powers any authority to so conduct as to make and divide a profit", fits the matter in hand.

The mere fact that during the last few years the plaintiff institution has been financially successful because of good management, increased patronage, evidently increased results

from its curative measures, thus making way for a larger number of patients, and other factors does not derogate from its historic and essential purpose.

As stated in 11 *C.J., Charities,* §9, p. 304: "The original eleemosynary character of the institution is not transformed by this patronage, even if sufficient to relieve it from financial burdens, but the charity as established remains unaffected." See *New England Sanitarium vs. Stoneham,* 205 Mass. 335, 91 N. E. 385; *Yale University vs. New Haven,* 71 Conn. 316; *Asylum vs. Phoenix Bank,* 4 Conn. 172. To some extent pertinent to the foregoing are: *Schusler's Appeal,* 81 Conn. 276, 278; *Fuller vs. Plainfield Academic School,* 6 id. 532, 544; *Town of Hamden vs. Rice,* 24 id. 350, 355; *Conklin vs. Davis,* 63 id. 377, 384.

The court has also considered the application of our statute of charitable uses, section 5000 of the General Statutes, Revision of 1930, and such cases as *Mitchell vs. Reeves,* 123 Conn. 549, 557, which cites with approval *American Academy of Arts and Sciences vs. Harvard College,* 78 Mass. (12 Gray) 582, 594. The doctrine stated in *Mitchell vs. Reeves* (p. 556) is applicable: " 'That a gift designed to promote the public good, by the encouragement of learning, science and the useful arts, without any particular reference to the poor, is regarded as a charity, is settled by a series of judicial decisions, and regarded as a settled practice of a court of equity.' . . . .

"All these objects, when divorced from the profit motive and so conducted as to serve not the interests of a particular group who may comprise an organization but those of the public at large, are within the field of proper charitable uses."

The court has not been unmindful of that well-stated doctrine in 61 *C.J., Taxation,* §500, p. 452: "In determining whether an institution falls within the scope of the exemption statutes the courts will consider not only the declared objects of the charitable or benevolent institution, but also what it actually does."

In the case at bar we have a declared object to benefit mankind by the care, treatment and if possible cure of the mentally ill. This, no doubt is a benevolent or charitable purpose. To be such it need not be itself an object of charity, or depend upon the possibly precarious generosity of temporarily interested persons, nor is it essential to its charitable character that

only the mendicant, the impecunious or the pauper may receive its benefactions. It is enough that sincere men devote their talents and energies to the common betterment of mankind by such measures of research, study and treatment, open alike to those who can and those who cannot pay, as on the whole tend to alleviate the distress of the sick, to open new fields of knowledge and treatment, to train others who may in turn serve, to restore the mentally ill to a normal life or arrest the incipient development of derangement.

Certainly the mere fact that those who can pay generously for the services of the plaintiff institution, do so, does not destroy its basic purpose. If by doing good it acquires funds by which to do more good it is no less a devoted servant of the community provided it neither does or can now, or in the future, acquire a pecuniary profit which either is or can, by any device, be distributed among its members, officers or agents.

I hold that the plaintiff Institute neither does or can make such distribution of profits and that its sole authority is to perform a function of public service.

Considering the list of well known and widely experienced men who compose the membership and board of directors, it is unthinkable that any among them would ever arise to say that he owned a distributive share in the least brick or stone of this institution, nor do I suppose any court would sustain such claim.

The court is indebted to counsel for both parties for carefully prepared briefs, for the thoroughness of preparation for trial, the cooperative manner in which it was conducted and the courteous attitude preserved.

The appeal is sustained and the properties of the plaintiff Institute ordered stricken from the taxable grand list of the City of Hartford.

\* \* \* \*

*The following portion of the plaintiff's brief is included in the foregoing memorandum of decision by reference (See ante, p. 378):*

In May, 1821 the attention of the Connecticut Medical Society was directed "to the hapless condition of the insane and their families." To ascertain what the Society referred to as "the magnitude of evil", information was obtained establishing

among other things that there were over one thousand victims of insanity in the State, "many of whom were confined by chains or immured in some lonely apartment and denied all liberty." (Report of Medical Committee — Exhibit A.)

A committee of the Society to whom the matter was referred subsequently reported in favor of a public Asylum to be established on humane principles and superintended by a society of patrons; and at a convention in October, 1821 the Society determined to solicit donations from those able and disposed to give and "in order that each subscriber might be assured that his charity would be judiciously extended" adopted a constitution for the government of a proposed Institution. The Society appropriated $600 from its available fund and individual subscriptions in the approximate amount of $19,000 were obtained. (A list of the subscribers, of the towns in which they lived, and of the amounts subscribed is contained in Exhibit D.)

As a result of the committee's report and the action taken at the convention hereinbefore referred to and upon the petition of Thomas Hubbard and others showing that one thousand insane persons dwelt in the State, that a subscription had been opened to provide them an asylum to mitigate their sufferings and restore their reason, and praying for an act of incorporation and a grant from the Treasury of the State in aid of the benevolent object, the General Assembly in May, 1822 passed an Act of Incorporation establishing a Retreat for the Insane under the name "The President and Directors of the Retreat for the Insane." (Exhibit B.) This Act, in which was incorporated the aforesaid petition of Hubbard and his associates, referred in its preamble to the large and liberal subscriptions obtained in behalf of the proposed Institution, recited in full its constitution theretofore accepted and approved by the October Medical Convention, supra, and resolved "that the articles of said constitution be and the same are hereby declared to be fundamental articles and part of the constitution of said corporation", and further resolved that "in aid of the benevolent object of said Institution there shall be paid to the said corporation upon an order of the Comptroller of Public Accounts....the sum of $5,000 out of the public treasury....", and authorized and requested the Governor to grant a brief annually for five years soliciting contributions for the benefit of the Institution and to issue a proclamation accordingly. At the first meeting of the

incorporators of the Institution held in Middletown on October 27, 1822 the Act of Incorporation was accepted and it was voted that the thanks of the meeting be presented to the Connecticut Medical Society "for their design to establish a charitable institution for the relief of the insane and for their liberal donation for its support." (Exhibit C.)

Included in the subscriptions received were those of the inhabitants of Hartford who offered the Institution approximately $4,000 provided that it should be established in that Town, and at a second meeting of the incorporators held in Hartford December 3, 1822 it was unanimously voted that "the location for the Retreat for the Insane be fixed in the Town of Hartford." Thereafter a part of the present site was acquired, a plan of building, previously submitted to and approved by the Governor of the State and the Commissioners appointed by the Legislature, was adopted, subscriptions were called in, and on April 1, 1824 the Institute commenced its benevolent task "consecrated to the blessing of the Almighty God." (Exhibit E.)

In May, 1824 a second resolve incorporating "The President and Directors of the Retreat for the Insane" was passed by the General Assembly. (Exhibit F.) In section 7 thereof the 1822 Act was repealed "provided, however, that everything which hath been done under and in pursuance of said Act shall have the same effect and shall be as good and valid to all intents and purposes as if said Act had not been repealed; and it is hereby declared that the corporation established by this Act shall be considered and holden to be the same corporation to all intents and purposes and to have the same rights as the coporation established by the Act hereby repealed and to be a continuance thereof.

"and provided further that this Act of Incorporation shall be subject to be altered or revoked at the pleasure of the General Assembly."

In 1824 the appropriation of $5,000 referred to in the 1822 Act of Incorporation was made to the plaintiff and the Governor of the State issued the briefs therein contemplated, referring therein to the opportunity afforded to the people of the State of "carrying into effect the benevolent intentions of the General Assembly." (See Exhibit G.)

## Subsequent Legislative History

The subsequent legislative history of the Institute included several amendments to its charter. In 1867 the Institute was authorized to borrow a limited amount of money and, further, to purchase, receive, hold and convey real and personal estate to an amount not exceeding $400,000 "which shall be free from taxation" (S.L. Vol. VI, p. 180). In 1901 the quoted clause was amended to read "which shall be free from taxation, except such taxes as shall be lawfully laid by the Washington School District of the Town of Hartford" (S.L. Vol. XIII, p. 1025). In 1905 the Institute's name was changed to "The President and Directors of the Hartford Retreat" and the method of elect-ing the Psychiatrist-in-Chief was simplified (S.L. Vol. XIV, p. 536). In 1927 the authorization in respect of the acquisition, holding and conveyance of real and personal estate was in-creased to $3,000,000 and it was further provided that "any estate so held shall be subject to taxation and entitled to tax exemption only in accordance with the provisions of the General Statutes" (S.L. 1927, p. 390). In 1939 the $3,000,-000 limitation was amended to permit the acquisition, holding and conveyance of real and personal estate of such value as was necessary or appropriate in the judgment of the Directors for the furtherance of the Institute's corporate purposes or the conduct of its operations (S.L. 1939, p. 194). In 1943 the name of the Institute was changed to "The Institute of Living" (S.L. 1943, p. 47).

## Appropriations

In the years 1845, 1853 and 1855 Acts were passed by the General Assembly authorizing payments to be made to the Institute out of the State treasury of $5,000, $8,000 and $6,000 respectively for building purposes. The $5,000 was expended under the direction of the Governor and the Comptroller of the State; the $8,000 under the superintendence of the Com-missioners of the Institute; and the $6,000 under the superin-tendence of its Managers. Additional appropriations were made by the General Assembly to enable the Institute to take care of the indigent insane until the establishment of the first State hospital at Middletown in 1868. (See Exhibit T, Annual Reports for 1859, pp. 21-24.)

## Taxation History

Except during the period from 1901 to 1927 when the Washington School District, acting under legislative authority

(S.L. 1905, supra), levied taxes on the Institute's properties, the Institute has never been subject to local property taxation or paid local property taxes of any kind or description. In each year since the foundation of the Institute, and until 1943, the Assessors of the Town of Hartford have excluded its property from the taxable property on the Grand List. The Institute has at all times complied with the statutory requirements relating to tax exempt institutions in respect of the filing of quadrennial statements with the Board of Assessors of the Town of Hartford on forms prescribed by the Tax Commissioner of the State. (Exhibits H-1, H-2, H-3.)

### Corporate Organization

The Institute is a specially chartered nonstock corporation and historically has always been considered a charitable institution (Private Laws of Connecticut, Vol. 1, Table of Contents and p. 342). Its charter powers are specifically limited to its function as a "Retreat for the Insane" and throughout its long history its Board of Directors has asserted and reiterated publicly that it is a purely charitable institution and that neither its members nor its directors have any interest in pecuniary profits, that they are in fact trustees for the insane and that their services are rendered without compensation. (See Annual Reports 1846, p. 5 etc.)

From 1822 to the present time the Institute's function as a "Retreat for the Insane" has remained unchanged. In recent years and in conformity with modern corporate practice the Board of Directors have expressed this limitation on the Institute's powers in the form by a by-law rededicating its property and funds perpetually to the care of the mentally ill and the development of facilities in aid of this purpose. (Exhibit K.)

Originally its members were the incorporators and their associates, and thereafter their successors. There are at the present time approximately 75 members, all of whom are residents of Connecticut, and approximately 30 of whom are residents of Hartford. The method of electing members, as set forth in Exhibit B. supra, was changed from time to time by the by-laws. A resume of such changes appears in Exhibit I. The Institute is managed by a Board of Directors, elected by the members annually, and by the Board of Managers when the Board of Directors is not in session. The Board of Managers is appointed by the Directors from their number. The

Directors appoint the Psychiatrist-in-Chief, who is the superintendent of the Institute and to whom is confided the medical and physical treatment of the patients and the chief administrative duties of the Institute. By virtue of the Institute's charter it is also his duty to determine the matter of admission and discharge of all patients. The Directors also appoint annually a Board of Medical Visitors and a Board of Nursing Advisors.

The Board of Medical Visitors meets periodically at the Institute to consider its medical problems and files an annual report with the Board of Directors. The Board of Nursing Advisors is responsible for the development of the program of teaching nurses and aides for service in the Institute and in other mental hospitals.

No director, officer (excepting the Treasurer) or member of the Institute receives any compensation for his services as such. No director, officer, member or employee of the Institute has ever received any pecuniary profit from the operations of the Institute except reasonable compensation for services in effecting the Institute's purposes. (The City may not concede this latter statement as a statement of fact in so far as it relates to the compensation paid the present Psychiatrist-in-Chief. In such event the subordinate facts in respect thereof and any argument deemed necessary in connection therewith will be presented and discussed in the Institute's Reply Brief.)

### Professional Organization

Science and medicine have endeavored to determine the extent to which the physical condition of an individual affects him mentally, as well as the extent to which mental attitudes affect his physical condition. While in many instances no precise conclusions can as yet be reached, nevertheless it is certain that a complete physical checkup in a majority of the cases is an essential to proper diagnosis and cure. In order to effect the maximum number of cures and in order also to develop new methods of treatment, the Institute has maintained a large staff of physicians and other therapists skilled in substantially all of the fields of medicine and psychology and has expended considerable sums for developing scientific, technical and surgical equipment and for the development of new and more advanced methods of therapy and reeducation leading to present day cure and has made such methods available to other institutions. The Institute has also maintained at considerable expense recreational and occupational facilities which

have an important therapeutic value in the cure of the mentally ill. The professional organization of the Institute includes the Resident Staff, the Courtesy Staff, the Consulting Staff, the Assisting Staff and the Faculty of Instructors. The personnel of these staffs, their titles and specialties are fully set forth in the 1943 Annual Report. (Exhibit J.)

*Properties*

The Institute is equipped to care for and treat any type of neuro-psychiatric disorder, whether or not complicated by physical disability. Its properties in Hartford comprise a tract of 33 acres on Washington Street, Retreat Avenue, Maple Avenue and Essex Street. The buildings located thereon include residence accommodations for the patients, extensive classrooms, gymnasium, buildings for scientific investigations and diagnoses, a chapel for religious devotion, various shops for the benefit, reeducation and convenience of the patients (such as a barber shop, beauty shop, library and shops for minor purchases and supplies), residence quarters for personnel, an administration building, a garage, heating plant and service buildings. There are facilities for vocational, avocational, social and recreational and physical education training; and several physiotherapy units with all the recognized form of such therapies.

As of March 31, 1943 the book value of all of the Institute's capital assets aggregated $830,261. (Exhibit J. p. 43 et seq.) On this date these capital funds were composed of the General Fund in the amount of $354,196, the Special Fund in the amount of $141,586, the Consolidated Fund in the amount of $297,312, the Retirement Fund in the amount of $28,376, the Research Lectureship Fund in the amount of $2,500, the Guest Deposit Account Fund in the amount of $5,000 and an unallocated fund in the amount of $2,000. With respect to the General Fund, the Special Fund, the Research Lectureship Fund and the unallocated fund, the assets thereof have been acquired exclusively through bequests and donations made by individuals to the institute for its general and, in a few cases, specific purposes. In addition thereto and throughout the Institute's history, there have been donations of land, buildings and personal property from various individuals to the Institute for its benevolent purposes. There have also been many cash gifts received from individuals which have been applied towards the construction and improvement of the buildings located on

the Institute's premises and the purchase of facilities useful in connection with its operations.

In 1931 the Institute's physical properties, medical equipment and facilities were in a serious state of disrepair and obsolescence. Faced with the necessity of renovation, replacement, refurnishing, the acquisition of modern equipment and the extension of recreational and therapeutic facilities essential to the proper care, treatment and cure of the mentally ill, and recognizing the obstacles to a general campaign for funds by reason of the existing worldwide depression and the specialized nature of the Institute's service, the Board of Directors approved and put into operation a policy which it was hoped would place the Institute in the forefront of hospitals of similar character (and which it did). This policy called for reasonably good wages and salaries in order that adequate personnel might be obtained; service to patients equal to or better than that offered in other institutions of like character; provision for rebuilding and replacement of facilities; a research program; a program for the training of personnel; a program of expansion and improvement of the properties along æsthetic as well as practical lines, not only as an essential part of the proper therapeutic program, but to attract the best minds in the psychiatric field and also to attract patients of means in order that the development and improvement of the Institute might continue to the benefit and welfare of the public.

On September 28, 1942, the Board of Directors authorized the expenditure of a sum not in excess of $5,000 for the development of architectural plans designed to modernize and enlarge the Institute's physical properties to an extent deemed necessary generally to promote the public welfare and specifically to further the interests of patients treated at the Institute. Thereafter, on March 21, 1943, the architect's plans and working drawings for modernizing the Institute, contemplating plant construction at an estimated cost of $616,700, were submitted. No action in respect thereof has been taken as yet by the Institute.

Pursuant to the policies and program hereinabove referred to, the Consolidated Fund, composed of a Clinical Research Fund, a Nursing Research Fund and a Depreciation Fund, was established and gradually increased by transfers thereto from the operating earnings of the Institute. The income therefrom has been utilized as the respective names imply.

## Patients

Since its founding in 1822, 22,963 patients have been treated at the Institute. Of this number, 7,278 were treated from and after April 1, 1931. This very substantial increase was made possible by the expansion of residence facilities paid for out of earnings. At the commencement of the fiscal year ending March 31, 1943, there were 298 patients in residence. Of these, 120 were from Connecticut. During this fiscal year 650 patients were admitted, 291 of whom were residents of Connecticut. Thus, in this particular year, 411 Connecticut persons were treated at the Institute.

Patients are admitted to the Institute upon reference thereto by a reputable physician. With the exception of alcoholics, drug addicts, epileptics and certain chronic cases who may be admitted under restricted circumstances, all mentally ill patients able to finance their own way are admitted. During the last twelve years and theretofore so far as appears in the records, no Connecticut case admissible under the medical standards of the Institute has ever been denied admission because of inability to pay. Patients are discharged on cure, improvement or after determination by the medical staff that the Institute is unable to be of further benefit to the patient or the patient is one requiring a protracted period of treatment.

Throughout its existence the Institute has had mentally ill persons from all walks of life. In the fiscal year ending March 31, 1943, the majority of the 650 patients admitted were factory workers, mechanics, clerks, salesmen, carpenters, plumbers, gardeners, stenographers and small businessmen, or the wives, or, in the case of unmarried women, the daughters of such persons, with a sprinkling of lawyers, doctors, teachers and business executives. (Exhibit R.) The wide variety of patients treated in this year is but a continuation of the Institute's policy of former years. The Annual Reports are replete with tables showing the types of patients treated and a remarkably broad cross section of American life is represented in all of them. (Exhibit T.)

The regular charge for board and room includes the services of the Institute's qualified psychiatrists, the facilities, teachers and classes in vocational, avocational, social and recreational and physical educational training, the entertainments and the various forms of medical and therapeutic treatments including physiotherapy and psychotherapy. The basic rate for Con-

necticut residents, which has always been less than that charged nonresidents, is $49 per week and for nonresidents $52.50 per week.

### Charity Cases

With respect to the charge hereinabove referred to, the general policy of the Institute from the year 1822 has been to require patients to pay their own way. Throughout its history, however, some patients have been admitted to the hospital who have been unable to pay their own way in whole and, in many cases, even in part. With respect to the 1,574 Connecticut patients resident during the period commencing April 1, 1937 and ending March 31, 1943, an analysis establishes that they were residents in the hospital for a total of 140,918 patient days. 187 of these patients in residence for a total of 13,809 patient days (9½% of the total Connecticut patient days) paid nothing for the services of the Institute. During this same period 33 of these Connecticut patients in residence for a total of 2,189 patient days paid from $1 to $10 per week for the Institute's services, and many others paid less than $25 per week. All of these patients had private accommodations and no person connected with the Institute, except the medical staff, knows their identity. The reason therefor is succinctly stated in the Report of the Board of Managers for the year 1936 (Exhibit S): "We have no organized charity service within the institution and there are no halls or wards set aside for charity cases distinct from those who are able to pay. If this were done, however, today it would require more than an entire hall to take care of those who are paying nothing at all, not to mention those paying something less than the general hospital charity rate.... The organizing of a special charity service, setting apart a poverty group from those who are more fortunate would be bad psychological medicine and poor for psychiatric cases.... This advanced sociological attitude may be lost sight of by the public which is used to having hospitals emphasize their charity service." (The above report also contains a detailed analysis of the charity work done by the Institute in 1936.)

### Performance

Three State hospitals for the care, treatment and cure of the mentally ill have been established. All of these hospitals are now, and for many years have been, seriously overcrowded. The Institute, founded in 1822, was the first hospital in Con-

necticut devoted exclusively to its specialty — namely, the care, treatment and cure of those suffering from neuro-psychiatric illnesses. It was organized at the outset and operated for this exclusive purpose. It has never deviated from this purpose and, as above set forth, has cared for and treated as many as 23,000 patients, the majority of whom have been residents of Connecticut. Its properties and funds, derived from subscriptions, legislative grants, legacies, gifts and fees from patients treated at the hospital from 1822 to the present time, have been expended solely and exclusively for its maintenance, operation and improvement as a neuro-psychiatric hospital devoted to the prevention, care and cure of mental illness, the teaching of methods in respect thereof and research in matters pertaining to development and improvement in the field of psychiatry.

In pursuance of its general purpose the Institute has entered into agreements with Columbia University and the University of Connecticut. By virtue thereof doctors at the Institute receive credit for the postgraduate degree of Doctor of Medical Science in Neurology and Psychology. Nursing students receive training in psychiatry, psychology and sociology and in respect thereof credit is given by the aforesaid Universities towards the bachelor's degree. A postgraduate school in psychiatric nursing is maintained at the Institute at a university level and at the present time has more alumnæ than any postgraduate school of psychiatric nursing in the country.

Mental illness has increased at an alarming rate. There are approximately 1,200,000 hospital beds in the United States. Of these, approximately half are devoted to mental illnesses. The Institute, with a view to attacking the problem at its source, carries on extensive research in the field of psychiatry. Research in the uses of endocrine glands, in allergy and diet, in electroencephalography (study of electric brain waves), and in the new shock therapies, has been and is now being carried on in an active and scientific manner with resultant improvement in technique, in diagnosis, in controlling treatment, and in substantial increases in the number of cures. Research in the fields of psychology and in the social sciences has resulted in the use today of some of the Institute's developments in the American, British and Canadian armed forces.

The Institute's library in the field of neurology and psychiatry, open to the public, is probably the most complete library of its kind in the world. From this library an educational

service is carried on without cost to its beneficiaries and reaches practically every psychiatrist in the country; this service is also being used today by our own armed forces as well as the Canadian and British armed forces. Biweekly approximately four thousand sets of abstracts and translations of leading articles pertaining to psychiatry and related subjects are prepared by the Institute's staff and sent to psychiatrists and medical societies in every State in the Union, in thirty-seven foreign countries, to 80% of the Army camps in the United States, and to thirty-five different Army post offices, including the Fleet post offices.

In connection with the Selective Service System and pursuant to the Institute's policy to further the prevention and cure of mental illness, the Institute, at the request of the United States Government, has examined without charge over 230 cases of draftees to enable Draft Boards to properly determine the draft status of selectees. Such examinations have in many cases required several days and more of study and the same thoroughness is applied in respect thereof as is the case of any regular patient treated at the Institute.

In each year since 1934 a series of lectures has been held at the Institute upon subjects relating to mental illness designed to offer a comprehensive survey of developments in psychiatry and related fields of medicine. These lectures are open to qualified members of the medical profession. The program of the 1944 series is contained in Exhibit P.

All of this research, educational and Government work has been contributed by the Institute to the public welfare without charge.

Financial summaries of the Institute's operations for the twelve fiscal years from April 1, 1931 to March 31, 1943 are contained in Exhibit M. As therein more fully appears and as has been the practice of the Institute from the date of its incorporation in 1822, the Institute's net operating income has been expended, or set aside as a reserve, solely for the repair, replacement, construction and reconstruction, improvement and development of its buildings, facilities and research and educational programs.