******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# VICTOR H. ASHE ET AL. *v.* YALE UNIVERSITY
## (AC 47443)

Cradle, C. J., and Alvord and Suarez, Js.

*Syllabus*

The plaintiffs, alumni of the defendant university, appealed from the trial court's judgment granting in part the defendant's motion to dismiss, granting the defendant's motion for summary judgment and denying the plaintiffs' motion for summary judgment. The defendant's board of trustees included six alumni fellows elected by alumni, a position created by an 1872 amendment to the defendant's charter. From 1929 until 2021, an alumnus could utilize a petition process to be placed on the ballot as a candidate for the alumni fellow position. After the petition process was eliminated, the plaintiffs commenced the present action against the defendant, claiming a violation of the Connecticut Revised Nonstock Corporation Act (§ 33-1000 et seq.) and breach of contract. On appeal, the plaintiffs claimed, inter alia, that the court improperly determined that the plaintiffs lacked standing to pursue their breach of contract claim because they were not third-party beneficiaries of the defendant's charter. *Held*:

The trial court properly granted the defendant's motion for summary judgment on the plaintiffs' breach of contract claim on the ground that the plaintiffs lacked standing, as, considering the language and circumstances of the 1872 amendment, and the defendant's course of conduct, the charter permitted the defendant to regulate alumni fellow elections and did not impose on the defendant an obligation to conduct alumni fellow elections in a particular manner, and, because the purpose and motives behind the 1872 amendment were intended to benefit the defendant, not the plaintiffs, the plaintiffs were not third-party beneficiaries of the charter for purposes of standing.

The trial court properly granted the defendant's motion to dismiss the count of the plaintiffs' complaint alleging ultra vires acts by the defendant in instituting certain candidate restrictions and terminating the petition process in violation of the Connecticut Revised Nonstock Corporation Act, as the plaintiffs were not members of the defendant, a nonstock corporation, pursuant to statute (§ 33-1038 (b) (1)), and, accordingly, the plaintiffs lacked standing to bring a claim under the act.

Argued September 16—officially released December 2, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior

Court in the judicial district of New Haven and transferred to the judicial district of Hartford, Complex Litigation Docket, where the court, *Farley, J.*, granted in part the defendant's motion to dismiss; thereafter, the court, *Farley, J.*, denied the plaintiffs' motion for summary judgment and granted the defendant's motion for summary judgment; judgment for the defendant, from which the plaintiffs appealed to this court. *Affirmed.*

*Eric Henzy*, for the appellant (plaintiffs).

*Jonathan M. Freiman*, with whom was *Gautam Rao*, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiffs, Victor H. Ashe and Donald G. Glascoff, Jr., alumni of the defendant, Yale University, appeal from the judgment of the trial court denying their motion for summary judgment, granting the defendant's motion for summary judgment,[1] and dismissing their claim alleging ultra vires acts in violation of the Connecticut Revised Nonstock Corporation Act (act), General Statutes § 33-1000 et seq. On appeal, the plaintiffs claim that the court improperly (1) rendered summary judgment in favor of the defendant because the court incorrectly determined that the plaintiffs lack standing on the basis that they are not third-party beneficiaries of the defendant's charter, and (2) granted the defendant's motion to dismiss their ultra vires claim because the court improperly determined that alumni are not members within the meaning of the act and,

---

[1] "The denial of a motion for summary judgment is ordinarily not an appealable final judgment; however, if parties file cross motions for summary judgment and the court grants one and denies the other, this court has jurisdiction to consider both rulings on appeal." (Internal quotation marks omitted.) *Atlantic St. Heritage Associates, LLC* v. *Atlantic Realty Co.*, 216 Conn. App. 530, 533 n.1, 285 A.3d 1128 (2022).

thus, the plaintiffs lacked standing to bring the claim.[2] We affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The defendant is a Connecticut nonstock corporation governed by a board of trustees (board) consisting of nineteen members, including the president of the defendant; ten successors to the trustees originally named in the corporation's charter (successor trustees), who elect their own successors and are usually limited to two six year terms; six "alumni fellows" elected by alumni and limited to one six year term; and the governor and lieutenant governor of Connecticut, who are ex officio members. The alumni fellow position was created by an 1872 amendment to the defendant's charter that allowed eligible alumni to serve as members of the board. From 1872 to 1929, eligible alumni could nominate candidates for the alumni fellow position and candidates with more than twenty-five electors would appear on the ballot. Beginning in 1929, alumni could utilize a petition process by which they needed to obtain a certain number of signatures to be placed on the ballot as a candidate for the alumni fellow position. Over the years, the defendant increased the number of signatures required by the petition process and eventually eliminated the petition process altogether in 2021. The elimination of the petition process leaves only one method for alumni to be nominated for the alumni fellow position and that is through the approval of the Alumni Fellow Nominating Committee of the Yale Alumni Association (YAA Nominating Committee).

---

[2] In its motion to dismiss, the defendant argued that the plaintiffs lacked standing as to each of their claims. The trial court granted the motion to dismiss as to count one and denied the motion to dismiss as to count three "without prejudice to its renewal in the context of the parties' anticipated cross motions for summary judgment." The court did not issue a decision on count two because the plaintiffs abandoned it during oral argument on September 19, 2022.

In March, 2022, the plaintiffs commenced the present action by way of a three count complaint. In count one, the plaintiffs claimed that the defendant's "action in instituting the candidate restrictions and terminating the petition process violated the [act] and the charter," thus constituting an ultra vires act. They claimed they had standing as "members of [the defendant]" within the meaning of General Statutes § 33-1038 (b) (1), which provides standing to a member or director of a nonstock corporation to challenge alleged ultra vires acts by the corporation. In count two, they alleged breach of contract in that the charter constitutes a contract between the defendant and its alumni and that the defendant breached that contract with respect to the rights granted to alumni in the 1872 amendment by instituting candidate restrictions and terminating the petition process. In count three, the plaintiffs again alleged that the defendant breached the contract by instituting the candidate restrictions and terminating the petition process, but asserted that the charter is a contract between the defendant and the General Assembly, under which the defendant assumed a direct obligation to the defendant's alumni with respect to the rights specified in the 1872 amendment.

On June 3, 2022, the defendant filed a motion to dismiss all counts of the complaint, claiming that the plaintiffs lacked standing to assert each of their claims. The plaintiffs filed a memorandum of law in opposition. On September 19, 2022, the court, *Farley, J.*, heard oral argument, during which the plaintiffs abandoned count two of their complaint. In its December 14, 2022 order, the court granted the motion to dismiss count one, concluding "that the plaintiffs are not 'members of [the defendant]' with standing to sue for ultra vires acts under § 33-1038 (b) [(1)]." It determined that the defendant's charter clearly establishes that the only members of the defendant corporation are the members of the

board. With respect to count three, the court denied the motion to dismiss "without prejudice to its renewal in the context of the parties' anticipated cross motions for summary judgment."

In June, 2023, the plaintiffs moved for summary judgment on count three. Shortly thereafter, the defendant also moved for summary judgment on count three and, in response, the plaintiffs filed a memorandum in opposition to the defendant's motion.

In their motion for summary judgment, the plaintiffs argued that the language of the charter and the 1872 amendment make clear that the defendant and the General Assembly intended that the defendant would assume an obligation "to allow all eligible alumni to vote for alumni fellow positions and . . . to be eligible to be alumni fellows." Therefore, the plaintiffs argued, alumni are third-party beneficiaries of the charter and the defendant's actions violated its terms with respect to alumni rights when it imposed candidate restrictions and terminated the petition process. In its motion for summary judgment, the defendant argued, inter alia, that the plaintiffs do not have standing as third-party beneficiaries.[3]

---

[3] The defendant also argued that the charter does not provide the plaintiffs a private right of action, that its actions do not violate the charter, and that the statute of limitations bars the breach of contract claim. As to whether the defendant's actions violate the charter, the court concluded that because the plaintiffs lack standing to advance their claims that the defendant violated the charter, it lacked jurisdiction to adjudicate those claims.

Additionally, the court did not reach the issues of whether the charter provides a private right of action or whether the plaintiffs' claims are time barred. On appeal, the defendant argues, as an alternative ground for affirmance, that, even if the plaintiffs are third-party beneficiaries, they still lack standing because "the charter is not just a private contract, but also a legislative enactment, and one that does not contain a statutory private right of action." The defendant also argues, as an alternative ground for affirmance, that, even if the plaintiffs have standing under the charter or through the act, their challenges to "candidate restrictions," including signature requirements for those looking to appear on the ballot, are time barred under General Statutes § 52-576 because they were enacted more than twenty years ago. Because we agree with the court that the plaintiffs lack standing

The court, *Farley, J.*, held oral argument on the motions for summary judgment on October 30, 2023. In its February 26, 2024 memorandum of decision, the court stated: " 'Yale University' is a title used pursuant to authority granted by the state 'by the corporation existing under the name of "The President and Fellows of Yale College, in New Haven." ' 10 Spec. Acts 467, No. 45 (1887). The roots of Yale College extend back to the beginning of the eighteenth century when, in 1701, the general court of Connecticut granted several self-appointed trustees the privilege of founding a collegiate school. *Yale University* v. *New Haven*, 71 Conn. 316, 326–27, 42 A. 87 (1899). In 1745, the general court 'enacted, ordained and declared' that the eleven trustees of Yale College 'shall be an incorporate society, or body corporate, and politic, and shall hereafter be called and known by the name of "The President and Fellows of Yale College in [New Haven]," and that by the same name they and their successors shall and may have perpetual succession, and shall and may be persons capable in the law to plead and be impleaded, defend and be defended, and answer and be answered unto . . . .' "

"In 1792, the general court appropriated funds 'for the use and benefit of Yale College in [New Haven]' and, if the grant was accepted, provided that 'the Governor, Lieutenant Governor, and six senior assistants in the Council of this State' shall be 'trustees or fellows of said college; and shall together with the present President and Fellows of said college, and their successors, constitute one corporation, by the name, and style mentioned in the charter of said college . . . .' "

The trial court noted: "The charter, as amended, was confirmed by article eighth, § 1, of the Connecticut constitution of 1818 and carried forward to the present.

to bring these claims, the defendant's claim that it did not violate the charter and its alternative grounds for affirmance need not be addressed.

. . . In 1819, the General Assembly reaffirmed the positions of the governor and lieutenant governor as trustees, but replaced the 'six senior assistants' with 'six senior senators' and provided that they, 'together with the President and Fellows of said college, and their successors, constitute one corporation, by the name and style mentioned in the charter of said college, with all the powers and privileges, thereto pertaining, by virtue of their charter, as modified by said act of the legislature.' . . .

"In 1871, the General Assembly amended the charter by eliminating the six senior senators as trustees and providing for the election of six Yale alumni as trustees in their stead. The plaintiffs' claims arise out of the 1871 amendment, which the General Assembly reenacted in 1872 with revised language. The 1871 amendment was in four sections, the first two addressing the election of alumni fellows and §§ 3 and 4 providing that the amendment was effective only upon the acceptance and consent of the defendant and that future changes also required the defendant's consent. . . . Section 1 of the 1871 amendment provided for the first election of alumni fellows to occur at the time of the 1872 commencement. In pertinent part, § 1 provided that all undergraduate alumni of five or more years and all those with graduate degrees may 'cast their votes, under such regulations as the president and fellows . . . may prescribe, for six persons to be chosen from among such graduates' to serve as trustees in place of the six senior senators. Section 2 dealt with alumni fellow elections to occur annually after 1872 and provided that 'every year as a vacancy occurs, [all undergraduate alumni of five or more years and all those with graduate degrees] shall, upon commencement day in the manner heretofore prescribed, elect a person to fill the vacancy . . . .' On June 12, 1872, the legislature reenacted the

1871 amendment, making certain revisions to the language.[4]

"Following the 1871 amendment, prior to the adoption of the 1872 amendment, a notice appeared in The New York Times on March 21, 1872, informing eligible graduates of their right to 'vote and be voted for in the coming election.' All had the right 'to send . . . before May 1, the names of six persons whom they desire to nominate . . . . The names of all candidates thus nominated by more than twenty five electors will be subsequently announced.' . . . Those duly nominated then appeared on the ballot for election at commencement in July, 1872. This process, including the requirement of twenty-five nominations to gain access to the ballot, was followed until 1929. In 1929, the defendant adopted regulations establishing two paths to being placed on the ballot for election as an alumni fellow: nomination by the predecessor to the YAA, and a petition process in which all eligible alumni could participate. Over time, additional regulations were adopted, which the plaintiffs refer to as 'candidate restrictions.'

"The plaintiffs allege the candidate restrictions exceeded the defendant's authority to prescribe regulations for the election to the extent that they went beyond regulating the voting procedure ('time, place and manner type provisions') and regulated 'who may be voted for and who may put themselves up as a candidate . . . .' For example, beginning in 1929, only three persons could be nominated by petition. Blank spaces on the ballot, facilitating write-in votes, were

---

[4] "The defendant accepted this amendment in July, 1872. Of note, the 1872 amendment replaced the requirement of election by a majority in the 1871 amendment with election by a plurality. The changes also included moving the election to the day prior to commencement instead of conducting it on the day of commencement. Also, whereas § 2 of the 1871 amendment provided that the alumni 'shall' elect an eligible alumnus to fill a vacancy, the 1872 amendment provides that the alumni 'may' do so."

eliminated in 2002. The number of signatures required to petition onto the ballot increased from 50 in 1929 to 250 in 1959. In 2002, the defendant adopted a regulation providing that a petitioning candidate needed signatures from 3 percent of the previous year's electorate to gain access to the ballot. The petition process was used infrequently over the years, but recently alumni, including [Ashe], have sought to use the petition process. [Glascoff] claims he had intended to run for election but has been deterred by the defendant's most recent decision to eliminate the petition process altogether.

"In the 2021 election, [Ashe] and another alumna obtained enough petition signatures to qualify for the ballot. The other petitioning candidate had to drop out for unrelated reasons and [Ashe] was unsuccessful in the election. Immediately following that election, the defendant announced the elimination of the petition process. In announcing this change, the defendant cited its concern about the emergence of 'issues-based candidacies, with intense campaigning by petitioners who are materially supported by organizations that seek to advance specific platforms.' The defendant expressed the view that such candidacies 'would do profound disservice to the university by distorting the very nature of what a Yale trustee must be: a fiduciary.' The defendant also expressed a concern that the election process might become costly and contentious, discouraging good candidates from participating. Eliminating the petition process left only endorsement by the YAA Nominating Committee as a path to being elected as an alumni fellow. The plaintiffs consider this an effort by the defendant to stifle the representation of alternative views on the [board] and otherwise control the composition of the board." (Citations omitted; emphasis omitted; footnote altered; footnote in original; footnotes omitted.) On the basis of the foregoing, the court

determined that the plaintiffs are not third-party beneficiaries to the defendant's charter and, accordingly, granted the defendant's motion for summary judgment and denied the plaintiffs' motion for summary judgment. This appeal followed.

I

The plaintiffs first claim that the court improperly determined that the plaintiffs are not third-party beneficiaries to the defendant's charter and, thus, lacked standing to bring the breach of contract action. The plaintiffs assert that "[t]he language of the 1872 amendment, the circumstances surrounding its drafting, legislative approval and adoption by the defendant, and the 149 year course of conduct that followed clearly establish that the purpose of the 1872 amendment was to provide alumni discretion in selecting alumni fellows, including the ability to directly nominate candidates . . . ." Therefore, they contend, alumni are third-party beneficiaries of the 1872 amendment because the parties to the charter, the defendant and the General Assembly, intended the defendant to assume a direct obligation to alumni in connection with these rights. We are not persuaded.

We begin by setting forth the well settled standard of review and legal principles governing our resolution of this claim. Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles

of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant . . . [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *United Cleaning & Restoration, LLC* v. *Bank of America, N.A.*, 225 Conn. App. 702, 716, 317 A.3d 2 (2024).

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . [If] a party is found to lack standing, the court is consequently without subject matter jurisdiction to determine the cause. . . . We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . .

In addition, because standing implicates the court's subject matter jurisdiction, the issue of standing is not subject to waiver and may be raised at any time." (Internal quotation marks omitted.) *Hilario's Truck Center, LLC* v. *Rinaldi*, 183 Conn. App. 597, 603, 193 A.3d 683, cert. denied, 330 Conn. 925, 194 A.3d 776 (2018).

"[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Citation omitted; internal quotation marks omitted.) Id.

"It is well settled that one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract . . . ." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 579, 833 A.2d 908 (2003). "A [third-party] beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract. . . . Therefore, a [third-party] beneficiary who is not a named obligee in a given contract may sue the obligor for breach." (Citation omitted; internal quotation marks omitted.) *Hilario's Truck Center, LLC* v. *Rinaldi*, supra, 183 Conn. App. 604.

"Whether a party is a third-party beneficiary of a contract is a question of the intent of the contracting parties. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact . . . . [When] there is definitive contract language, [however] the determination of what the parties intended by their contractual commitments is a question of law. . . . It is implicit in this rule that the determination as to whether contractual language is

plain and unambiguous is itself a question of law subject to plenary review. . . . We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . Where the language is unambiguous, we must give the contract effect according to its terms. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. . . .

"[O]ur courts have continued to refer to the intent of the parties to create a *direct obligation* between the promisor and the beneficiary as the test for determining whether a nonparty to the contract is a third-party beneficiary thereof. . . . In determining whether a person has a right of action as a third-party beneficiary, [t]he ultimate test to be applied . . . is whether the intent of the parties to the contract was that the promisor should assume a *direct obligation* to the third-party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties. . . . Further, [t]he

intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but *what intention is expressed in the language used.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) *United Cleaning & Restoration, LLC* v. *Bank of America, N.A.*, supra, 225 Conn. App. 717–18.

In its decision, the court "[found] that the evidence presented concerning the circumstances surrounding the 1871 and 1872 amendments, including the motives and purposes of the parties, [was] inconclusive as to whether the plaintiffs hold third-party beneficiary status under the charter as it concerns alumni fellow elections." Therefore, to determine whether the plaintiffs have standing as third-party beneficiaries, the court moved to the merits of the parties' dispute over whether the defendant may exercise regulatory authority over the entire alumni fellow election process under the charter. After reviewing the language, circumstances, and the defendant's course of conduct, the court concluded that "the charter . . . permits the defendant to regulate [alumni fellow elections] . . . [and] does not impose on the defendant an obligation to conduct alumni fellow elections in a particular manner." It further determined that the purpose and motives behind the 1872 amendment were intended to benefit the defendant, not the plaintiffs. Therefore, the court concluded that the plaintiffs were not third-party beneficiaries for purposes of standing.

We first consider the plaintiffs' argument that the trial court improperly interpreted the text of the 1872 amendment. They assert that the defendant had to have assumed a direct obligation to alumni because, in the 1872 amendment, "alumni were *by name granted specific rights* to 'cast their votes, under such regulations

as the president and fellows, may prescribe, for six persons to be chosen from among such graduates . . . .' " (Emphasis in original.)

We agree with the following analysis and determination provided by the court. "The 1871 and 1872 amendments to the defendant's charter must be read in the overall context of the charter. From the outset of [the defendant's] existence, the [board] has had broad regulatory authority over the management and administration of its affairs. The 1745 act gave the defendant its charter and endowed it with corporate status. *Yale University* v. *New Haven*, supra, 71 Conn. 326–27. The act provided that the defendant 'shall have the government, care and management of the said College, and all the matters and affairs thereunto belonging, and shall have power, from time to time, as occasion shall require, to make, ordain and establish all such wholesome and reasonable laws, rules and ordinances . . . as they shall think fit and proper, for the instruction and education of the students, and ordering, governing, ruling, and managing the said College and all matters, affairs and things thereunto belonging . . . .' The 1871 and 1872 amendments reference that authority by recognizing the defendant's right to prescribe regulations in connection with the election of alumni fellows. The amendments contain no language purporting to narrow the broad scope of the defendant's right to self-governance established in the 1745 charter. Nor do the amendments themselves include any regulations concerning the manner in which alumni fellow elections were to be conducted. Absent some inconsistency between the broad language contained in the 1745 charter and the 1871 and 1872 amendments, the defendant's authority to prescribe regulations in connection with the election of alumni fellows is as broad and unlimited as it is with respect to the rest of the defendant's affairs.

"The plaintiffs construe the language of the 1872 amendment to restrain implicitly the defendant's otherwise broad regulatory authority. They argue that the placement of the phrase 'under such regulations as the president and fellows, may prescribe' in § 1 of the amendment must be construed to restrict the defendant's regulatory authority to time, place and manner considerations. The plaintiffs argue that the defendant has no power to regulate alumni access to the ballot. The plaintiffs' argument rests upon their view that the phrase 'under such regulations as the president and fellows, may prescribe' applies only to the casting of votes and not to the nomination process. Section 1 of the 1872 amendment states that eligible alumni 'may . . . cast their votes, under such regulations as the president and fellows, may prescribe, for six persons to be chosen from among such graduates . . . .' The plaintiffs invoke the last antecedent rule to argue that the defendant's power to regulate is limited to alumni 'cast[ing] their votes' and does not apply to the 'persons to be chosen.' "

The court noted that the plaintiffs invoked the last antecedent rule by asserting that the placement of the phrase "under such regulations as the president and fellows, may prescribe" contained in § 1 of the amendment must be construed as restricting the defendant's regulatory authority to time, place, and manner considerations. (Internal quotation marks omitted.) The court, however, determined that the last antecedent rule does not apply in this context because it applies only when there are several antecedents that precede the limiting clause. "Cast their votes" serves as the only antecedent to the limiting phrase.[5]

---

[5] The court relied on the last antecedent rule, which is "a principle of contract and statutory interpretation pursuant to which a limiting clause or phrase is read as modifying only the noun or phrase that immediately precedes it . . . unless the limiting language is separated from the preceding noun or phrase by a comma, in which case one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immedi-

The court further noted that "the language the court must construe appears in § 2 of the 1872 amendment, not § 1. The plaintiffs, focused on § 1 and the last antecedent rule, argue that the defendant's authority to regulate is limited to the casting of votes and the amendment 'does not grant [the defendant] the power to regulate elections.' . . . Section 2 provides, in relevant part, that, in the event of a vacancy, eligible alumni 'may, upon the day next preceding commencement day, in the manner heretofore prescribed, elect by a plurality of votes a person to fill the vacancy . . . .' "

The court explained: "The modifying phrase 'in the manner heretofore prescribed' can logically refer only to the election of a person to fill the vacancy. While not dispositive of the issue, because § 2 does incorporate § 1's modifying phrase, this undermines the plaintiffs' grammatical analysis given in support of their position that the defendant's regulatory authority applies only to the time, place and manner of the casting of votes and does not apply to the election as a whole." (Emphasis omitted.)

We agree with the court that the phrase "in the manner heretofore prescribed" encompasses the modifying phrase in § 1 of the amendment and that it "can logically refer only to the election of a person to fill the vacancy." Moreover, § 2 is the only section that addresses elections to fill vacancies, as § 1 discusses the election of alumni fellows in the year 1872 and provides in part "for six [candidates] to be chosen from among such graduates." Additionally, the phrase "in the manner heretofore prescribed" contained in § 2 modifies "elect by a plurality of votes a person to fill the vacancy." Although the term "elect" in § 2 may refer to the broader election process, inclusive of nomination procedures,

ately preceding it. (Citations omitted; internal quotation marks omitted.) *Karas* v. *Liberty Ins. Corp.*, 335 Conn. 62, 102–103, 228 A.3d 1012 (2019)."

the phrase "by a plurality of votes . . . to fill the vacancy" indicates that this phrase likely refers to the casting of votes only, and not to the phrase "to be chosen from among such graduates," contained in § 1. Therefore, it would not be reasonable to conclude that § 2, which concerns electing an alumni fellow by a plurality of votes to fill recurring vacancies, encompasses the manner in which candidates were to be nominated in 1872.

The court further noted that, "[o]ther than their analysis based on the last antecedent rule, the plaintiffs cite no language in the 1872 amendment that limits the defendant's broad regulatory authority over the management and affairs of the university in the context of alumni fellow elections. In support of the proposition that the defendant's authority extends no further than the time, place and manner of voting, the plaintiffs cite no language at all. The amendment contains no such explicit restriction, and the plaintiffs offer only the last antecedent rule to support their argument that the restriction they advocate is implicit in the language of the amendment. There are things the charter would unambiguously prohibit. For example, the defendant cannot unilaterally eliminate the position of alumni fellow, change the eligibility requirements, or prevent eligible alumni from voting. The amendment, however, is silent on the nomination process. It does not require a petition process and does not prohibit the defendant's involvement in the nomination process."

We agree with the court's determination that the 1872 amendment does not contain any explicit restriction over the defendant's authority to regulate the alumni fellow nomination process. We also agree with the court that "the amendment's placement of the modifying phrase 'under such regulations as the president and fellows, may prescribe' arguably diminishes its clarity."

Therefore, the court properly considered and was persuaded by "[o]ther indicia . . . that it was intended that the defendant would have the authority to regulate the entire election process, not just the time, place and manner of voting," as the plaintiffs claim.

The plaintiffs next argue that "[t]he circumstances attending the making of the 1872 amendment further support that alumni are intended third-party beneficiaries of the charter." The plaintiffs assert that it is implied that the parties to the 1872 amendment did not intend for the defendant to have control over the election of the alumni fellows, providing the following as support for this claim. First, the defendant knew how to create a fully self-perpetuating board but, instead, "expressly created a board that is not a fully self-perpetuating governing body, and expressly granted direct rights to alumni to elect alumni fellows and to put themselves forward as candidates for the alumni fellow positions." Second, the plaintiffs claim that the amendment was intended to benefit alumni because "granting to alumni . . . the right to vote for alumni and the eligibility for the alumni fellow positions was a response to demands from alumni that alumni be given a direct voice in governance of the defendant . . . ." They allege that the "Young Yale" movement and efforts seeking to modernize the university and include more alumni representation show that "[t]here was a specific intention to create a countervailing voice to the successor trustees on the board."

We agree with the following analysis and conclusion of the trial court related to the circumstances surrounding the creation of the 1872 amendment. "The plaintiffs do not argue that the charter explicitly establishes a direct obligation to eligible alumni, but argue such a direct obligation is implicit in the charter's language and is reflected in the circumstances surrounding

the adoption of the 1871 and 1872 amendments. Regarding the latter, the plaintiffs cite evidence that in the 1860s and early 1870s, a movement called 'Young Yale' emerged seeking to modernize the university and increase alumni involvement in the management of the university. A leader within this movement, W. W. Phelps, was among the first group of alumni fellows elected. By their own admission, however, the 'principal evidence' the plaintiffs rely upon is the 'plain language of the charter itself.' The charter does confer a benefit upon eligible alumni—the opportunity to participate in the management of the university by casting votes and proffering themselves as candidates in alumni fellow elections. The plaintiffs argue it may be inferred that the benefit so bestowed was a direct response to the demands of Young Yale and thus was intended to create an obligation to the alumni on the part of the defendant.

"The defendant has submitted evidence tracing the origin of the change in governance at Yale to an 1866 article in The New Englander authored by the Reverend Theodore Woolsey, Yale's president from 1846 to 1871. In the article, Woolsey reviews changes made to the charter of Harvard College in 1866. The Harvard charter had been amended by the Massachusetts legislature to provide that Harvard alumni would elect members of the Board of Overseers, which regulated the affairs of the corporation. In that context, Woolsey considered whether Yale would benefit from a similar change in governance. He observed that the 'principal defect' in the defendant's charter, as most recently amended in 1819, was that the senators serving as fellows 'in general [took] little interest' in the positions they held and reflected their disinterest by their lack of participation in the meetings of the corporation. This lack of interest had been evident since 1828, when senate terms were limited to one year and reelection was not the norm. The corporation met only once each year in that era,

so senators on the board would attend, at most, one meeting and then be replaced. In Woolsey's view, replacing the senators with graduates elected by other graduates would result in 'greater interest, punctuality, knowledge, sense of responsibility, and devotion to the welfare of the institution . . . .'

"The defendant's charter was amended on July 6, 1871, to provide for the election of alumni fellows. On May 2[5], 1871, weeks before the amendment was adopted, an article appeared in The Nation addressing the proposed change to the charter. D. C. Gilman, 'Proposed Change in the Corporation of Yale College,' The Nation, May 2[5], 1871, pp. 355–56. The article reaffirms that Woolsey, who was about to retire as president, had originally proposed alumni participation in the governance of the university. Marshall Jewell, then the governor of the state, formally proposed amending the charter. The article quotes Jewell as follows: 'The Corporation now consists of eleven gentlemen, who fill vacancies in their own number, and the governor, [lieutenant governor], and six senators of the State. While the interest and representation of the State in this venerable college is very large, its official connection with it is, in fact, almost nominal, as it is rarely the case that any of the six senators attend meetings of the Corporation. The great body of the graduates, who have a deep interest in the college, and, being scattered throughout every State, can wield the strongest influence for its welfare, have no direct voice in its management. I therefore suggest whether it would not be well for the State, the college, and the alumni at large to surrender to the latter one-half of the State representation in its Board of Corporation—the new members to be elected by the alumni to serve for four years . . . .'

"The article's author, a Yale professor and former Yale librarian, summarized the events leading up to the

change in governance as follows: '[I]t must be admitted that the Corporation has lost the moral support of large numbers of the graduates, who are clamorous for a change. These graduates are not the younger graduates only. Some of the best men in the land are among the number. Nor should it be forgotten that it was the President of the college himself, ripe in experience, conservative by nature and by habit, and devoted to the promotion of the college, who first proposed the reconstruction of the Corporation. This he did several years ago in his famous New Englander article. His views, which were met at first with distrust, dissent, and opposition, have at last been very generally accepted by the friends and graduates of the institution, and his administration seems likely to close with the achievement of this crowning glory. Any one can see that some change must soon take place, or the present Corporation will fail to receive the support of the graduates; so far, at least, as this—that future gifts will be made under such restrictions and limitations as to leave the trustees but the slightest amount of discretion in respect to their management.' The article concludes with the only contemporaneous evidence regarding the nomination process, suggesting that 'the details of arrangements in respect to the methods of nomination and election should be left to the president and fellows, who may be trusted to act in good faith.'

"Certain aspects of the surrounding circumstances support the plaintiffs' theory that the reform in governance was undertaken to assuage disgruntled alumni who demanded a meaningful role in the management of the university in exchange for their continued financial, practical and moral support. In this respect, the change in governance might be viewed as primarily directed to benefit the alumni. Other aspects, particularly the rationale offered by Woolsey, the amendment's principal proponent, support the view that the defendant

sought, for its own benefit, to modernize its management and solicit the assistance of alumni who could be counted on to bring knowledge, skill and devotion to the effort, in contrast to the historically disinterested involvement of the senators. In this respect, the change in governance was adopted purely for the defendant's benefit, and the benefit conferred upon alumni was incidental. The plaintiffs bear the burden to establish standing as third-party beneficiaries. . . . Cognizant of that burden, the court finds that the evidence presented concerning the circumstances surrounding the 1871 and 1872 amendments, including the motives and purposes of the parties, is inconclusive as to whether the plaintiffs hold third-party beneficiary status under the charter as it concerns alumni fellow elections." (Citations omitted.)

We now consider the plaintiffs' argument that the defendant's repeated performance of allowing alumni to put themselves forward as candidates for the past 149 years demonstrates its intent that alumni have the right to nominate candidates for alumni fellow positions. The court determined that "[t]he defendant's course of conduct prior to 1929, in 1929, and thereafter until the present reflects a construction of the charter that permits the defendant to regulate access to the ballot." We agree with the following determination made by the court.

"It is of some significance that the first alumni fellow election involved a degree of regulation applied to limit access to the ballot. Prior to the first alumni fellow election scheduled for July, 1872, and prior to the adoption of the 1872 amendment in June, 1872, a notice appeared in The New York Times on March 21, 1872, informing eligible graduates of their right to 'vote and be voted for in the coming election.' All had the right 'to send . . . before May 1, the names of six persons whom they desire to nominate . . . . The names of all

candidates thus nominated by more than twenty five electors will be subsequently announced.' . . . The defendant restricted access to the ballot by requiring twenty-five nominations as a prerequisite to appearing on the ballot. The defendant placed this restriction on the process pursuant to the language contained in the 1871 amendment, before the adoption of the 1872 amendment, and there was no change to the relevant language in the 1872 amendment. If the defendant had misconstrued its authority to regulate access to the ballot, one would have expected that error to be corrected when the 1872 amendment was adopted. The defendant has consistently exercised regulatory authority over the nomination process since then. The petition process instituted in 1929, whose elimination prompted the plaintiffs' lawsuit, is itself an example of the defendant's exercise of regulatory authority over the nomination process. At the same time, in 1929, the defendant introduced the process of screening a certain number of alumni fellow nominations through YAA's predecessor. The plaintiffs take no exception to the defendant's exercise of its authority to establish these procedures but complain only that one of them has been taken away.

"The plaintiffs argue that the intent of the parties upon adopting the 1871 and 1872 amendments to the charter was that the defendant would have no authority to regulate access to the ballot. The amendments themselves provide no regulation of the nomination process. The plaintiffs' construction of the amendments would provide all eligible alumni with unrestricted access to the ballot. In an unregulated nomination process, the election ballots could easily grow to an unwieldy size and the required plurality could be achieved with a distinct minority of the votes cast. Construing the amendments to allow such unfettered access to the ballot appears unreasonable. The plaintiffs seek to

avoid this unreasonable result by highlighting the qualitative change introduced by the elimination of the petition process—an end to what they characterize as 'direct access' to the ballot. They seek a restoration of the petition process, requesting in their prayer for relief an injunction against future alumni fellow elections 'as long as the petition process is not in place . . . .'

"[The plaintiffs] do not explain, however, where the defendant obtains the authority to regulate the nomination process by imposing a petition process on alumni fellow nominations, by establishing a threshold for gaining access to the ballot, or by imposing any other restraint. Their construction of the charter is that the defendant may only regulate the time, place and manner of voting and may not regulate who may stand for election and be elected. And yet they ask the court to order the defendant to reinstate the petition process, pursuant to which access to the ballot is restricted by a requirement that nominees achieve a threshold number of signatures to have their name placed on the ballot. While the plaintiffs seek the removal of other 'candidate restrictions,' the restrictions they complain of do not include imposing a prerequisite threshold of nomination or petition signatures needed to gain access to the ballot, nor do the plaintiffs seek to eliminate the path for nominations through the YAA created in 1929. Establishing the procedure for the nomination of candidates by the YAA was also a form of regulating access to the ballot.

"The plaintiffs argue that the defendant's course of conduct since 1872 reflects a construction of the charter that is consistent with their view that the process established in 1929 must continue. What the course of conduct reveals, however, is that the defendant has always exercised control over access to the ballot. The very

first election, in 1872, was conducted under the restriction that only those with twenty-five or more nominations would have their names placed on the ballot. The plaintiffs argue, however, that this threshold requirement is consistent with 'direct access' to the ballot, meaning that only other eligible alumni had the ability to screen candidates and prevent them from accessing the ballot. Eliminating such direct access[6] is what violates the charter, according to the plaintiffs. If so, the defendant improperly imposed itself on the process in 1929, when it created a path to access the ballot through YAA's predecessor. Adopting that procedure did not eliminate direct access to the ballot, but it did intrude upon the screening power the plaintiffs ascribe only to eligible alumni. It manifests, within the defendant's course of conduct, the defendant's recognition of its authority to regulate alumni fellow elections pursuant to the charter. . . .

---

[6] The court also found that the 1871 and 1872 amendments do not contain language requiring "direct access" and that the case relied upon by the plaintiffs is therefore distinguishable from the present case. Specifically, the court found that, "[i]n *Healy* v. *Loomis Institute*, 102 Conn. 410, 128 A. 774 (1925), the attorney general sought an injunction requiring the defendant to educate girls as well as boys. The court held the defendant was required to do so. One factor supporting that conclusion was that the defendant had educated girls for the first nine years of its existence. . . . In *Healy*, however, the language of the charter made this conclusion inescapable. The charter provided that the defendant 'should furnish free and gratuitous instruction for "all persons" between the ages of twelve and twenty-one . . . .' Id., 415. 'In every section of the charter the reference to those who are to be benefited is to "persons," and in no instance is there a limitation of the sex of the persons to be benefited.' . . . The education of girls for the first nine years was 'persuasive evidence' that the court was correct. . . . '[E]ven more persuasive and conclusive consideration is found in the language of § 2 [of the charter]: "But no person shall be admitted as a student in said Institute until he or she shall be adjudged, on examination, capable . . . ." ' Id., 417. In contrast to this explicit reference to female persons in that charter, there is no language in the defendant's charter requiring unmitigated access to the ballot. The plaintiffs' characterization of the defendant's course of conduct in the present case, as reflecting a requirement that 'direct access' to the ballot be provided, cannot be attached to any language in the defendant's charter." (Citations omitted.)

"The defendant's course of conduct prior to 1929, in 1929, and thereafter until the present reflects a construction of the charter that permits the defendant to regulate access to the ballot. It does not bind the defendant to maintain a particular nomination process indefinitely. The fact that the defendant created two paths to the ballot in 1929, one 'direct' and one 'indirect,' does not make either path compulsory. Either the defendant has the authority to regulate the nomination process, or it does not. Its course of conduct, as well as the language of the charter, reflects an understanding that it does have that authority. If it does, then it is not the court, but the defendant and the legislature that the plaintiffs must prevail upon to adopt the nomination process they desire. The defendant has eliminated neither alumni access to the ballot nor the right to vote. The defendant is exerting a degree of control over the process by requiring that all nominations come through the YAA Nominating Committee. The defendant's motives may be enlightened or self-interested, but it is not the court's role to police the defendant's motives. The court's role is to determine whether the charter permits the defendant to regulate alumni fellow elections. The court concludes that it does." (Citation omitted; footnote added; footnote omitted.)

On the basis of the evidence presented, we agree with the trial court's determination that the plaintiffs "failed to establish that the language of the charter provides them with the right to an unregulated nomination process." We therefore conclude that the trial court properly determined that the plaintiffs are not third-party beneficiaries and lack standing to advance their breach of contract claim against the defendant. Accordingly, the trial court properly denied the plaintiffs' motion for summary judgment and granted the defendant's motion for summary judgment.

## II

We now turn to the plaintiffs' claim that the trial court improperly granted the defendant's motion to dismiss count one of the complaint on the ground that the plaintiffs lacked standing as members of the defendant under § 33-1038 (b) (1) to bring an ultra vires action against it. The court determined that "[t]he defendant's charter clearly establishes that the only members of the nonstock corporation are . . . the '[board]' " and was unpersuaded by the plaintiffs' claim that because alumni have a right to vote for alumni fellows they are members of the defendant corporation. The plaintiffs maintain, however, that "[m]ultiple provisions of the [act] support the conclusion that a person who has the right to nominate and vote for [board] members or the right to be a board member is a 'member' within the meaning of the [act]." We disagree.

We first set forth the applicable standard of review and relevant legal principles. "Our standard of review of a trial court's findings of fact and conclusions of law in connection with a motion to dismiss is well settled. A finding of fact will not be disturbed unless it is clearly erroneous. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts . . . . Thus, our review of the trial court's ultimate legal conclusion and resulting [granting] of the motion to dismiss will be de novo. . . . A motion to dismiss admits all facts well pleaded and invokes any record that accompanies the motion, including supporting affidavits that contain undisputed facts." (Internal quotation marks omitted.) *JPMorgan Chase Bank, National Assn.* v. *Simoulidis*, 161 Conn. App. 133, 135–36, 126 A.3d 1098 (2015), cert. denied, 320 Conn. 913, 130 A.3d 266 (2016).

As discussed, "[i]t is a basic principle of law that a plaintiff must have standing for the court to have

jurisdiction. . . . Standing is the legal right to set judicial machinery in motion. . . . One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . It is axiomatic that aggrievement is a basic requirement of standing, just as standing is a fundamental requirement of jurisdiction. . . . There are two general types of aggrievement, namely, classical and statutory; either type will establish standing, and each has its own unique features. . . . Aggrievement does not demand certainty, only the possibility of an adverse effect on a legally protected interest. . . . Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation. . . .

"In order to determine whether a party has standing to make a claim under a statute, a court must determine the interests and the parties that the statute was designed to protect. . . . Essentially the standing question in such cases is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. . . . [Stated differently, the] plaintiff must be within the zone of interests protected by the statute. . . . The issue of whether § 33-10[38 (b)] authorizes the individual plaintiffs to bring an action challenging [the defendant corporation's power to act] presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent." (Citations omitted; internal quotation marks omitted.) *Charter Oak Health Center, Inc.* v. *Barcelona*, 234 Conn. App. 758, 770–71,    A.3d    (2025).

Under the act, "[a] corporation's power to act may be challenged: (1) In a proceeding by a member or director against the corporation to enjoin the act . . . ." General Statutes § 33-1038 (b) (1). General Statutes § 33-1002 (20) defines " '[m]ember' " as "a person having membership rights in a corporation in accordance with the provisions of its certificate of incorporation or bylaws." The defendant's charter refers to only "the Governor, the Lieutenant Governor, and six of the senators . . . as members of said corporation . . . ." This membership status then was conferred on alumni fellows that took the place of the six senators via the 1872 amendment. The charter does not designate any other person or class of people, including alumni, as members.

The plaintiffs argue that "[m]ultiple provisions of the [act] support the conclusion that a person who has the right to nominate and vote for [board] members or the right to be a board member is a 'member' within the meaning of the [act]." They rely on the act's broad definition of "member" as one with "membership rights" in a corporation to claim that the rights to vote for, and to be, a board member constitute such membership rights. They support this argument by listing provisions of the act that discuss membership in the context of voting. None of the provisions, however, defines a right to vote as a membership right.

First, the plaintiffs rely on § 33-1002 (6), which defines " '[c]lass' " as "all members that under the certificate of incorporation or sections 33-1000 to 33-1290, inclusive, are entitled to vote and be counted together collectively on a matter at a meeting of members. All members entitled by the certificate of incorporation or said sections to vote generally on the matter are for that purpose a single class." This provision states that members of a class are entitled to vote but does not provide that those with a right to vote are members of

a class. Thus, § 33-1002 (6) does not offer support for the plaintiffs' argument.

The plaintiffs also rely on General Statutes § 33-1083 (c), which provides: "In the cases of (1) corporations without members and (2) corporations without members entitled to vote for directors, the certificate of incorporation may provide for a self-perpetuating board of directors." The plaintiffs posit that "[b]y providing that Yale alumni elect the alumni [fellows], the charter expressly makes the corporation not fully self-perpetuating, i.e., the corporation does not select all of its own members." They fail to explain adequately, however, how the defendant not selecting all board members supports their argument that alumni are members. They seem to allege that, because alumni can vote for a subset of directors, the board is not fully self-perpetuating and, therefore, the alumni must be members because they are entitled to vote. Section 33-1083 (c), however, does not accommodate such an interpretation, as it does not state that if a board is not self-perpetuating, all those who vote for a director are members.

The plaintiffs turn to General Statutes § 33-1084, which provides: "If the certificate of incorporation authorizes classes of members, the certificate may also authorize the election of all or a specified number of directors by members in one or more authorized classes of members." The plaintiffs contend that because the charter expressly authorizes alumni to vote for alumni fellows, these provisions would not make sense if alumni were not members within the meaning of the act. They seem to suggest that, because alumni vote for a specified number of directors—the alumni fellows— they must be considered a class of members as the defendant can only allow voting for a specified number of directors by a class of members if its certificate authorizes such class of members. That construction is only plausible, however, if those with the right to

vote are designated as members or if those particular voting rights are designated as membership rights. As noted, neither the charter nor the 1872 amendment identifies alumni as members, nor do they identify alumni rights to vote for alumni fellows as membership rights. Although these provisions indicate that members are entitled to vote, they do not require that those who can vote be members. The plaintiffs do not offer any legal authority to suggest otherwise.

The plaintiffs further argue that "alumni need not be labeled as members for alumni to be members within the meaning of the [act] . . . ." To support this assertion, the plaintiffs rely on federal case law to apply a definition of membership used to determine associational standing.[7] These cases, however, do not apply to the present case because they concern whether non-member organizations have associational standing when their constituents are not members in the traditional sense. The context and law under which these cases define members differ substantially from the present case. The plaintiffs do not assert that they are members of an association or that alumni fellows have associational standing to bring a claim but, instead, assert that they, as alumni, are members of a corporation with standing under the act to bring an ultra vires action.

---

[7] Among the cases cited by the plaintiff are *Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 344–45, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977) (concluding that, although Washington State Apple Advertising Commission was nonmember organization, its constituents, apple growers and dealers, possessed "all of the indicia of membership in an organization . . . [as] [t]hey alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them"), and *America Unites for Kids* v. *Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) ("[i]n applying *Hunt*, we have not required all these indicia of membership, so long as the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy" (emphasis omitted; internal quotation marks omitted)).

Finally, the plaintiffs assert that "persons voting for board members must have some legal relationship with the nonstock corporation"; (emphasis omitted); and "[t]he only legal relationship between the plaintiffs and the defendant that can be found to exist in the facts and circumstances here is that of member . . . ." The plaintiffs, however, do not offer any legal authority to support their contention that all those who are simply eligible to vote for certain board members have a legal relationship with the corporation and that this relationship affords them standing as members to challenge the corporation's power to act. For these reasons, we agree with the court's determination that the plaintiffs are not members and do not have standing under the act. Accordingly, the court properly granted the defendant's motion to dismiss count one of the plaintiffs' complaint.

The judgment is affirmed.

In this opinion the other judges concurred.